**John G. LANCASTER, Sr., as Conservator of the Person and Estate of Donald A. Lancaster, Plaintiff,**

v.

**The UNITED STATES SHOE CORP., Defendant.**

**The UNITED STATES SHOE CORP., Counter–Complainant,**

v.

**John G. LANCASTER, Sr., as Conservator of the Person and Estate of Donald A. Lancaster, Counter–Defendant.**

**No. C–95–0873.**

United States District Court, N.D. California.

Aug. 8, 1996.

---

Kenneth W. Pritikin, Foley, McIntosh & Foley, Lafayette, CA, for Plaintiff/Counter-Defendant John G. Lancaster.

Michelle D. Astabie, Robert M. Pattison, Michael D. Jacobster, Jackson, Lewis, Schnitzler & Krupman, San Francisco, CA, for Defendant/Counter-Complainant The United States Shoe Corp.

## OPINION AND ORDER ON MOTION FOR SUMMARY ADJUDICATION

BRAZIL, United States Magistrate Judge.

### I. INTRODUCTION

Donald Lancaster ("Lancaster") suffered serious head injuries after being hit by a car. He is now confined in a nursing home, where he needs total assistance for virtually all his daily living activities. Lancaster's conservator enrolled him in United States Shoe ("U.S. Shoe") Corporation's health care plan for retirees. U.S. Shoe has declined to pay benefits for Lancaster's confinement, relying primarily on two grounds: (1) Lancaster exhausted a 365-day limit in the benefits plan on convalescent care benefits; and (2) the care Lancaster received was "custodial" and, hence, not "medically necessary." Lancaster's conservator has filed an ERISA action against U.S. Shoe and has moved for summary adjudication.

We conclude that U.S. Shoe's denial of benefits was based on a legally impermissible interpretation of the benefits plan. We hold that, with one undisputed exception, the 365-day limit on convalescent care benefits is unenforceable. While the 365-day limit that U.S. Shoe attempts to enforce was in the benefits plan itself, it was not in the summary plan description. Where the summary plan description conflicts with the terms of the plan, the summary plan description controls.

We further hold, applying the doctrine of reasonable expectations, that it was improper for U.S. Shoe to deny benefits on the grounds that the care Lancaster received was "custodial." We find that, based on the summary plan description, an insured would have reasonable expectations of coverage for nursing home care in circumstances similar to those in which Lancaster finds himself. The summary plan description does not state that coverage for nursing home care is not provided if the care is "custodial" and does not state that care is not "necessary" if it is

"custodial." As we explain in detail below, denying coverage on the basis that care is "custodial" conflicts with the reasonable expectations of the insured.

We grant Lancaster's motion for summary adjudication. We remand this case to the administrator of the benefits plan for further proceedings in accordance with this opinion. We retain jurisdiction.

## II. FACTS

### A. *Lancaster's Accident*

1. On December 15, 1988, Lancaster was struck by a car. Lancaster Decl. (LD) at 2. At the time, he was an employee of U.S. Shoe. LD 2. As a result of the accident, Lancaster sustained major injuries, including head injuries. LD 2–3. He was taken to Santa Monica Hospital. AR 106. For a while, Lancaster was in a coma. LD 3.

2. Lancaster eventually emerged from the coma. LD 3. He was released from Santa Monica Hospital into a skilled nursing facility, Synergos Neurological Center, on May 5, 1989. LD 3; AR 106. In June 1990, Lancaster was transferred from Synergos into Greenridge Convalescent Hospital ("Greenridge"), another skilled nursing facility. LD 3; *see also infra* ¶ 19. Lancaster has remained at Greenridge since June 1990. LD 3. Lancaster requires total assistance for virtually all of his daily living activities. LD 3.

3. Donald Lancaster's injuries left him unable to handle his affairs. LD 3. A court appointed John Lancaster, Donald's brother, to serve as Donald's conservator. LD 3.[1]

### B. *The Benefits Plan*

4. U.S. Shoe provides its employees with a health benefits plan—the United States Shoe Corporation Health Care Protection Plan ("the Plan"). Muntel Decl. (MD) at 2. The Plan is self-funded. MD 2. The head administrator of the Plan is the U.S. Shoe Benefit Committee ("the Benefit Committee"). MD 2. The Benefit Committee dele-

gates most of its authority to administer the Plan, including the authority to process claims and to pay or deny claims, to Prudential Insurance Company of America ("Prudential"). MD 2. The Benefit Committee reviews appeals of claims determinations by Prudential.

5. U.S. Shoe summarized the contents of the Plan for its employees by preparing and distributing a summary plan description (SPD). U.S. Shoe has provided the court with three different SPDs, each bearing different dates. The earliest SPD is dated "1/84" (henceforth, "the 1984 SPD"). Hakes Decl. (HD), Ex. A. The second SPD is dated "4/1/89–3/31/90" (henceforth, "the 1990 SPD," or simply "the SPD"). HD, Ex. B. The third SPD is dated "Sept. 1991" (henceforth, "the 1991 SPD"). HD, Ex. C. As we will explain below, the SPD that is controlling for purposes of our decision is the 1990 SPD. *See infra* § III(E)(4).

6. At some time prior to July 20, 1990, the conservator's attorney reviewed the 1990 SPD. *See* AR 23. The 1990 SPD has the following important provisions. In an introductory section, the SPD states:

> The Health Care plan provides protection against expenses you and your dependents may incur due to illness or injury. The choices which are available vary in the portion of the expenses you are required to pay. *All the choices, however, protect you from the [sic] financial ruin due to a catastrophic condition.*

HD, Ex. B at 9 (emphasis added). The SPD also states that "[a] one million dollar lifetime cap has been placed on health care benefits for each person covered." HD, Ex. B, second (not numbered) page.

7. The SPD has a section entitled "Extended Convalescent Care Benefits." In its entirety, that section states:

> In order for any expenses to be covered, confinement in the Facility must start within 14 days following discharge from a hospital confinement of a minimum of three consecutive days. If necessary and

---

1. Henceforth, we refer to John Lancaster as "the conservator" and to Donald Lancaster as "Lan- caster."

reasonable, the following expenses are covered:

1. Room and board provided by the Facility except any charge that exceeds the Daily Room and Board Benefit of $18 to a maximum of $6,570 per disability.

2. Routine nursing care provided by the Facility, but not including a private duty nurse or other private-duty attendant.

3. Physical or speech therapy provided by the Facility or by others under arrangements with the Facility.

4. Medical social services provided by the Facility.

5. Such drugs, biologicals, supplies, appliances and equipment as are ordinarily provided by the Facility.

6. Medical services provided by an intern or resident-in-training of a hospital with which the Facility has a transfer agreement under a teaching program of the hospital but not including any other medical care or treatment by a doctor, including a resident doctor or intern, and other diagnostic and therapeutic services furnished to in-patients of the Facility by a hospital, and

7. Such other services necessary to the health of the patients as generally provided by the Facility.

Successive periods of confinement will be treated as one confinement unless:

a. The subsequent confinement is due to a completely unrelated cause or commences after complete recovery, or

b. In the case of your personal coverage, you have returned to active full-time work between confinements, or

c. In the case of your dependent at least 90 days have elapsed between confinements.

HD, Ex. B at 18.

8. In its "Definitions" section, the SPD defines "Extended Care Facility" as "an institution, or a distinct part of an institution, which has qualified as an Extended Care Facility for Medicare." HD, Ex. B at 9. The SPD defines "Home Health Care Agency" as

an organization, or its distinct part which,

a. Is primarily engaged in providing skilled nursing care and other therapeutic services for, and in the private residences of, persons recovering from an injury or disease, and

. . . .

d. Is not, other than incidentally, engaged in providing care or treatment of mentally ill, or in providing *custodial-type* care.

HD, Ex. B at 9 (emphasis added). Part of the SPD's definition of "Hospital" is "[a]n institution which . . . [i]s not primarily a place for rest or the aged . . . or a nursing or convalescent home." HD, Ex. B at 10. The SPD defines "Illness" as a "[b]odily disorder or accidental injury or mental infirmity," adding that "[s]uccessive bodily disorders and mental infirmities due to the same cause or related cause [sic] will be considered as one illness." HD, Ex. B at 10.

9. The SPD has a section called "Excluded Expenses." Within that section, the SPD states that coverage is not provided for

[s]ervices and supplies not reasonably necessary. To be "reasonably necessary", a service or supply must be ordered by a doctor and be commonly and customarily recognized throughout the doctor's profession as appropriate in the treatment of the diagnosed sickness or injury. It must neither be educational or experimental in nature, nor provided primarily for research. Also, the length of a hospital confinement and the hospital's services and supplies will be "reasonably necessary" only to the extent they are, as determined by Prudential, reasonably related to the treatment of the condition involved and not allocable to the patient's scholastic education or vocational training.

HD, Ex. B at 22.

10. The SPD has a section entitled "Home Health Care Benefits." In that section, the SPD states, "Expenses due to the following are not covered Home Health Care Expenses: . . . Care comprised of services and supplies which are provided to a Covered Individual primarily as custodial care assisting him in the activities of daily living." HD, Ex. B at 17.

11. A section entitled "General Expenses" provides coverage "for payment up to 80% of the reasonable and customary amount" for "[n]ursing, speech therapy, physiotherapy or occupational therapy not rendered by yourself, spouse, or a child, brother, sister, or parent of yourself or spouse." HD, Ex. B at 21.

12. The SPD states, "In general, your participation in the Flexible Benefit Program ends on the date you stop working ... However, you may be able to continue participation in the Program by taking the proper actions." HD, Ex. B at 3. The SPD adds, "Employees eligible for an immediate payout of retirement benefits may be offered the option to continue their own and their dependents' participation in the Health Care plan." HD, Ex. B at 4.

13. The 1984 SPD is significantly different from the 1990 SPD. The most important difference, for our purposes, is that the 1984 SPD does not have a section addressing "Extended Convalescent Care Benefits." *See* HD, Ex. A. The 1984 SPD does have a section which states that coverage is given for "Nursing Care—Private duty nursing by a registered graduate nurse," "In or Out of the Hospital." HD, Ex. A at 41.

14. The 1991 SPD, on the other hand, is very similar to the 1990 SPD. There are only two differences of potential significance. The first is that the language "[i]f necessary and reasonable, the following expenses are covered," in the "Extended Convalescent Care Benefits" section of the 1990 SPD, is replaced in the 1991 SPD by the language "[i]f the charges are usual and prevailing, the following expenses are covered." HD, Ex. C at 17. The second difference is that the exclusion for "[s]ervices and supplies not *reasonably* necessary" is replaced in the 1991 SPD by an exclusion for "[s]ervices and supplies not *medically* necessary." HD, Ex. C at 20 (emphasis added). The exclusion in the 1991 SPD states:

> To be 'medically necessary,' a service or supply must be ordered by a physician, must be commonly and customarily recognized throughout the physician's profession as appropriate in the treatment of the diagnosed sickness or injury and must be

generally accepted by United States medical standards. It cannot be educational not [sic] experimental or investigational in nature. 'Educational' means that the primary purpose of the service or supply is to provide a patient with any of the following: training in the activities of daily living, instruction in scholastic skills such as reading and writing; preparation for an occupation; or treatment for learning disabilities. "Experimental or investigational" means that the medical use of a service or supply is still under study and the service or supply is not yet recognized throughout the physician's profession in the United States as safe and effective for diagnosis or treatment. Services or supplies which are provided only because an unnecessary service or supply is being provided will also be considered not needed. The length of a hospital confinement and the hospital's services and supplies will be "medically necessary" only to the extent that they are, as determined by the Claim Administrator, reasonably related to the treatment of the condition involved and not allocable to the patient's scholastic education or vocational training.

HD, Ex. C at 20.

15. The Plan itself is a document separate from the SPD. The Plan has the following important provisions. The Plan states:

> The Benefit Committee shall have the power to administer this Plan and also such additional powers as may be conferred upon it by the Trust, including without limitation, the following powers ...:
>
> ....
>
> (b) to interpret and construe this Plan in a nondiscriminatory manner consistent with its terms and provisions and with Section 501(c)(9) of the Internal Revenue Code of 1954, as amended; to determine all questions of eligibility and the status and rights of Employees, Qualified Dependents and others; to determine the benefits payable under this Plan and, where applicable, the method of distribution thereof; to make and enforce rules and regulations relating to such determination; and to decide such questions as may arise in connection with the operation of this

Plan, whether or not specifically covered by any provision of the Plan; ...

PD, Ex. C.

16. The Plan has a provision entitled "Convalescent Nursing Home Care Provisions Under Major Medical Expense Benefits." This provision states:

The term "Convalescent Nursing Home" means only an institution meeting the following requirements:

(1) It is operated pursuant to law and is primarily engaged in providing, for compensation from its patients, the following services for persons convalescing from sickness or injury—room, board and twenty-four hour a day nursing service by one or more professional nurses and such other nursing personnel as are needed to provide adequate medical care.

(2) It provides such services under the full-time supervision of a proprietor or employee who is a Physician or a registered graduate nurse (R.N.).

(3) It maintains adequate medical records, and has available the services of a Physician under an established agreement if not supervised by a Physician.

(4) It has established methods and procedures for the dispensing and administering of drugs and biologicals.

(5) It has a written transfer agreement in effect with one or more hospitals.

The term "Convalescent Nursing Home" shall not include any institution or part thereof which is used principally as a rest facility for the aged, for drug addicts, for alcoholics or for the mentally ill.

For the purpose of the Major Medical Expense Coverage, when charges are made by a Convalescent Nursing Home for the additional services and supplies described below which are furnished during a person's confinement therein and while the conditions set forth below are satisfied, those charges shall be considered charges made by a Hospital and that confinement shall be considered a Hospital confinement.

*Additional Services and Supplies:* Subsection (1) and (2) of the [Major Medical Expense] Coverage are enlarged to include the following additional services and supplies—

(a) Convalescent Nursing Home room and board (including regular daily services and supplies furnished by the Convalescent Nursing Home);

(b) Routine nursing care provided by the Convalescent Nursing Home but not including the services of a private-duty nurse or other private-duty attendant;

(c) Physical or speech therapy provided by the Convalescent Nursing Home or by others under arrangements with the Convalescent Nursing Home;

(d) Medical social services provided by the Convalescent Nursing Home;

(e) Drugs, biologicals, supplies, appliances and equipment as are ordinarily provided by the Convalescent Nursing Home for the care and treatment of its inpatients;

(f) Medical services provided by an intern or resident-in-training of a hospital with which the Convalescent Nursing Home has in effect a transfer agreement under a teaching program of such hospital; and

(g) Other services and supplies, exclusive of professional services, furnished by the Convalescent Nursing Home for medical care therein.

Limitations—The additional services and supplies shall be included only:

(1) **If furnished during no more than three hundred sixty-five days of the person's Convalescent Nursing Home confinement due to the same or related causes,** and

(2) To the extent that the room and board charges therefor do not exceed a daily limit of $18.00.

*Conditions:* All of the following—

(1) The person was confined in a Hospital for a least three consecutive days.

(2) The Convalescent Nursing Home confinement is recommended by his Physician for convalescence from a condition which caused such Hospital confinement, or from a related condition, and commences

(a) within fourteen days after discharge from such Hospital confinement or

(b) within fourteen days after a related Convalescent Nursing Home confinement.

(3) He is under the continuous care of his Physician.

(4) Twenty-four hours a day nursing care of the person is essential, as certified by his Physician.

*Related Convalescent Nursing Home Confinements:* Separate Convalescent Nursing Home confinements of a person will be considered related unless—

(1) the later confinement commences after complete recovery from the illness causing an earlier confinement, or

(2) the later confinement results from causes entirely unrelated to the causes of an earlier confinement, or

(3) in the case of an Employee, the confinements are separated by his compliance with the active work requirement of the General Definitions, or

(4) in the case of a dependent of the Employee, the confinements are separated by at least ninety days.

PD, Ex. E (bold emphasis added).

17. The Plan also has a section entitled "Convalescent Nursing Home Expense Benefit Provisions Under Hospital Expense Benefits." MD, Ex. A at CNH–2A. There are no material differences, for purposes of this case, between this section and the section entitled "Convalescent Nursing Home Care Provisions Under Major Medical Expense Benefits." *See* MD, Ex. A at CNH–2A.

18. The Plan excludes payment for "Charges for Unnecessary Services and Supplies," defined as "charges for any service or supply not reasonable necessary for the medical care of the patient's sickness or injury; charges made by a Hospital to the extent that they are allocable to scholastic education or vocational training of the patient, as determined by the Employer." PD, Ex. D.

18b. Part of the Plan's definition of "Hospital" states:

In no event· shall the term "Hospital" include a convalescent nursing home or in-

clude an institution or part thereof which (i) is used primarily as a convalescent facility, rest facility, nursing facility or facility for the aged, or (ii) furnishes primarily domiciliary or custodial care, including training in the routines of daily living, or (iii) is operated primarily as a school.

PD, Ex. D.

19. Both parties agree that Greenridge is a "convalescent nursing home" as defined by the Plan. *See* The United States Shoe Corporation's Separate Statement of Undisputed Facts at 3; Astabie Decl., Ex. A, Ex. B.

## C. *Lancaster's Enrollment in the Retiree Benefits Plan*

20. The conservator learned that U.S. Shoe had given Lancaster the status of a retired employee because Lancaster was totally disabled. LD 3. Responding to inquiries, Prudential wrote a letter on March 27, 1990, to the conservator's attorney, which stated:

This letter is to provide clarification on the Extended Convalescent Care Benefits as provided by the U.S. Shoe Plan.

The Plan allows $18.00 for Room and Board at 100% for 365 days for a maximum of $6,570.00 per disability. Once this $18.00 daily Room and Board benefit is exhausted, the balance of the Room and Board is not eligible.

*The other ancillary charges provided by the facility* such as physical or speech therapy, drugs, etc. *would be payable at 80% for an unlimited number of days* as long as services are medically necessary and Mr. Lancaster remains covered under the Plan.

Administrative Record (AR) 13 (emphasis added).

21. On May 17, 1990, U.S. Shoe wrote the conservator a letter, stating that Lancaster was eligible to be enrolled in U.S. Shoe's retiree medical plan for a $34.49 monthly premium. AR 15. In a letter directed to Lancaster, addressed to the care of the conservator and dated July 16, 1990, U.S. Shoe stated, "To continue the medical insurance you currently have would cost $34.49 per month." AR 21. The conservator enrolled

Lancaster in U.S. Shoe's retirees' health benefits plan on July 20, 1990. LD 3; LD, Ex. A.

22. In a letter dated July 19, 1990, the conservator's attorney asked U.S. Shoe to confirm the following:

As a member of the Retiree's Health Plan, [Lancaster] is entitled to all benefits that he was entitled to and receiving as an active employee as set forth in U.S. Shoe's Flexible Benefits Policy dated 4/1/89 to 3/31/90, including but not limited to page 18 Extended Convalescent Care Benefits. The *only difference* between the active employee's health care benefits and the retiree's health care benefits is that payments made by Prudential under the Retiree's Health Plan are reduced by whatever payment is made by Medicare.

AR 23 (emphasis in original). In a letter dated August 20, 1990, Prudential stated that it was "able to concur" with those two statements, except that "[i]n addition to this ['only'] difference, a retiree does not have to comply with two of U.S. Shoe's cost-containment features, the Pre–Certification requirement for inpatient hospital stays (PACRS) and the Second Opinion Program for inpatient surgery (SSOP)." AR 27.

**D. *Prudential's Cessation of Benefits***

23. Prudential paid benefits for charges incurred for Lancaster's confinement at Greenridge through June 1993. LD 3. Prudential stopped paying for the Greenridge charges in July 1993, and has not paid for any Greenridge charges since. LD 3.

24. Between July 1993 and July 1994, there were oral and written communications between the conservator's attorney and Prudential regarding the status of payment for the Greenridge charges. *See* AR 41–52. According to Prudential claim file notes dated December 16, 1993, a Prudential claims representative told the conservator's attorney in a phone conversation that "[t]he U.S. Shoe Plan is set up to only cover expenses medically necessary to the tr[eatment] of an illness or injury, not to maintaining a condition" and that "CONVALESCENT means 'getting well, one who is recovering from a disease or operation, the period of recovery

after the termination of a disease or an operation' as defined by [a] Medical Dictionary." AR 265.

25. In a letter to Prudential dated July 26, 1994, the conservator's attorney described a telephone conversation that purportedly took place between him and a Prudential representative on July 20, 1994. According to the attorney, the Prudential representative advised him in that phone conversation that Lancaster was not entitled to benefits because "the word 'convalescent,' which appears in the U.S. · Shoe policy, is defined in some medical dictionary as progressing toward health, or getting better, and since Mr. Lancaster seems to have stabilized, he therefore has no coverage." AR 56. In the same letter, the attorney asked Prudential to clarify its position. AR 58.

26. In a letter to the conservator's attorney dated July 25, 1994, Prudential stated:

We contend that the services rendered to Mr. Lancaster at Greenridge Heights Convalescent Hospital are custodial in nature. . . .

Prudential defines custodial care as *"Care that provides a level of routine maintenance for the purpose of meeting personal needs. This is care that can be provided by a lay person who does not have professional qualifications, skills or training.* Custodial Care includes, but is not limited to: help in walking and getting into or out of bed; help in bathing, dressing, and eating; help in other functions of daily living or similar nature; administration of . or help in using or applying medications, creams and ointments; routine administration of medical gasses after a regimen of therapy has been set up; routine care of a patient, including · functions such as changes of dressings, diapers and protective sheets and periodic turning and positioning in bed; routine care and maintenance in connection with casts, braces and other similar devices, or other equipment and supplies used in treatment of a patient, such as colostomy and ileostomy bags and indwelling catheters; routine tracheostomy care; general supervision of exercise programs including carrying out of

maintenance programs of repetitive exercises that do not need the skills of a therapist and are not skilled rehabilitation services."

AR 53–54 (emphasis added).

### E. *Lancaster's Medical Condition*

27. A document entitled "Medical Referral" and date-stamped August 5, 1994, apparently from Prudential's claims department, addressed to Prudential's "Medical Department," asks the medical department to resolve only one issue in order to enable Prudential to determine whether benefits to Lancaster should be paid—"Are the services medically necessary in diagnosing/treating the patient's illness? Or is care custodial?" AR 291. In a document dated August 8, 1994, Dr. Earnest Austin of Prudential's medical department gave a three-word response—"Care is custodial." AR 292.

28. In a deposition taken for purposes of this litigation, Austin stated that Lancaster's medical records indicate that he is unable to ambulate, needs assistance in daily living, and is almost a total care resident. PD, Ex. H at 35. Austin stated that the records indicate that Lancaster needs assistance in all his daily living activities, except that he is able to feed himself when food is presented to him. PD, Ex. H at 36.

29. Austin stated that the medical records indicate that Lancaster was not receiving any skilled care at Greenridge—"care that required specialized skills [and] can only be rendered by a nurse ..." PD, Ex. H at 35–36. Austin stated that it was his opinion that it would be appropriate for Lancaster to be in a facility where he ordinarily receives care from nurses' aides or other caretakers who are not nurses but where a nurse is available if necessary. PD, Ex. H at 53.

30. The medical records in Prudential's claim file indicate that Lancaster needs to be fed a "mechanical soft diet" and "thickened liquids" and needs to be supervised when feeding, in order to avoid a danger of choking that is related to difficulty in chewing and swallowing. *See* AR 528, 552, 606, 607, 680, 755, 1150, 1156. One notation in the medical records states that, due to Lancaster's head injuries, there is "potential for shortness of breath," and that, in order to deal with this problem, Lancaster's attendants are required to "observe closely for shortness of breath," "notify MD as needed," and "educate and encourage resident to use call light when having difficulty." AR 1165.

31. The records also show that Lancaster must wear a seatbelt when in his wheelchair, must have two side rails up while in bed, and "requires proper body alignment at all times," for safety, to prevent him from sliding and pitching forward and falling out of his wheelchair or bed. *See* AR 742, 755, 1149, 1153. Furthermore, the records show that Lancaster's body needs to be periodically repositioned and that his extremities need to be periodically taken through their full range of motion, in order to reduce the risk of an ulcer related to immobility and to treat "contractures of upper and lower extremities." *See* AR 1148, AR 1154. In addition, the records show that Lancaster is incontinent. AR 1147.

32. Lancaster's medical records indicate that he received physical and speech therapy early in the course of his confinement at Greenridge, at least in his first two months there. This therapy apparently did not continue past Lancaster's first few months at Greenridge. *See* AR 590, 601, 682, 1377.

33. According to a declaration by Lancaster's physician, Lancaster needs to be in a skilled nursing facility because of his medical condition, especially because of the danger of choking created by his swallowing difficulties. De los Reyes Decl. at 3–4. According to the physician, no residential care facility would accept a patient in Lancaster's condition. De los Reyes Decl. at 3.

### F. *Prudential's Denial of Benefits*

34. On August 10, 1994, Prudential wrote a letter to the conservator's attorney, stating that it was denying payment for the Greenridge charges. Pritikin Decl. (PD) at 3. In the letter, Prudential stated that its "Medical Department" had reviewed Lancaster's claim. PD, Ex. B. Prudential stated that the "Medical Director" had determined that "the services rendered are custodial in nature." PD, Ex. B. Prudential added, "Care

that is not medically necessary is not eligible for reimbursement under the U.S. Shoe Group Plan and custodial care does not meet the U.S. Shoe definition of 'medically necessary services/supplies.' " PD, Ex. B. Prudential also stated that it had improperly paid charges for confinement at Greenridge prior to July 1993, and requested a refund from the conservator in the amount of $59,114.42. PD, Ex. B.

35. On September 23, 1994, the conservator's attorney sent a letter to Prudential, appealing Prudential's denial of Lancaster's claim. PD 3; AR 75–77. On October 20, 1994, Prudential wrote the conservator's attorney a letter, denying the appeal, and advising that any further appeal would have to be directed to U.S. Shoe. PD 3. The letter stated:

> It is our position that not only has Mr. Lancaster's confinements [sic] in the extended care facilities exceeded the policy limitations, it has been determined that the services being rendered are primarily custodial care for aid to daily living functions. Our Medical Department has reviewed the information submitted by the providers of these services and has concluded that this care could have been provided by a lay person who does not have professional qualifications, skills or training.

AR 101.

### G. *U.S. Shoe's Denial of Lancaster's Appeal*

36. On November 9, 1994, the conservator's attorney sent a letter to U.S. Shoe, appealing Prudential's denial of Lancaster's claim. PD 3. A cover letter from an unidentified U.S. Shoe employee to U.S. Shoe's Benefit Committee states the following:

> Attached for your review is a claim appeal regarding payment of convalescent care benefits.
> The associate was seriously injured when he was struck by an automobile in December 1988. He was hospitalized in Santa Monica Hospital from December 1988 until May 1989. On May 5, 1989 he was transferred to Synergos Neurological Center for extended convalescent care and in June 1990 transferred to Greenridge Heights

Convalescent Hospital. *Greenridge Hospital was billing room & board charges as $18.00/day at the associate's family's request since this is the amount covered by Prudential for room & board. The actual room & board charge was $105.00/day.* The additional $87.00/day was being billed as professional fees (including room & board, nursing care, food, maintenance, and dietary professional fees).

> *The extended convalescent care benefits available to this associate were exhausted when he met the maximum benefit allowed for this disability—$6,570* (see attached copy of extended convalescent care benefits per SPD). However, *all charges at Greenridge Hospital have been determined by both Prudential and Medicare to be ineligible since they are custodial in nature.*

> Prudential has overpaid the benefits by $59,114.42. Due to a dispute in the billing practices, Prudential stopped paying charges at Greenridge Hospital in September 1993. *There is a dispute between Prudential and the associate as to whether or not the care given is "medically necessary" . . . .*

AR 118 (emphasis added).

37. A notation by a Prudential claims representative in Prudential's claim file states that an official at Greenridge had told her that the total cost of Lancaster's residency was $105 per day and that the $105 included room and board, "nursing care, food, maintenance, dietary prof. fees." The notation also states that Greenridge "accommodated their fees for the patient's family" by billing only $18 per day for room and board in order to match the $18 per day room and board limit in the SPD. AR 262.

38. All the members of the Benefit Committee voted to deny Lancaster's appeal. The notes of the members of the Benefit Committee indicate that the major reasons for the denial were that the care given was custodial, that the care had been determined by Prudential not to be medically necessary, and that the Plan limits convalescent care benefits to one year. *See* AR 154–161.

39. On February 21, 1995, the chair of U.S. Shoe's Benefit Committee wrote to the conservator's attorney, stating that Lancaster's appeal had been denied. PD, Ex. B. The letter stated:

> The grounds for denial is [sic] based upon the fact that the benefit plan limits the payment of extended convalescent care benefits to a maximum of $6,570 per disability. Additionally, the group plan does not cover and will not pay for charges incurred for unnecessary services, that means services or supplies "not reasonably necessary for the medical care of the patient's sickness or injury." This includes custodial services.

PD, Ex. B.

### H. *Legal Proceedings*

40. The conservator filed an ERISA action. The conservator requests payment of benefits for confinement at Greenridge after July 1993. The conservator also requests a declaration of the parties' rights and duties with respect to payment of benefits for continued confinement at Greenridge. The conservator further asks for prejudgment interest, attorney's fees, and costs. First Amended Complaint at 4–5. U.S. Shoe has filed a counter-claim, requesting repayment of the alleged overpayment of benefits. Answer and Counter–Claim at 4.

41. Plaintiff has moved for summary adjudication of issues. Plaintiff requests that this court either reverse U.S. Shoe's denial of coverage or remand the case for further administrative proceedings.

### III. ANALYSIS

### A. *Reasons for the Denial of Lancaster's Claim*

In their correspondence with the conservator's attorney, U.S. Shoe and Prudential explicitly gave two reasons for denying benefits to Lancaster. The first was that the care given to Lancaster was not "reasonably necessary" or "medically necessary" but, instead, was merely custodial. *See supra* ¶¶ 34, 35, 39. In its correspondence, Prudential distinguished "custodial" care from "necessary" care mainly on the basis that "custo-

dial" care is "care that can be provided by a lay person who does not have professional qualification, skills, or training." *See supra* ¶¶ 26, 35. The second reason given was that Lancaster had exceeded a 365–day limit on "Extended Convalescent Care Benefits." *See supra* ¶¶ 35, 39.

A careful examination of the record reveals that two other considerations may have played some role in the denial of benefits by Prudential and/or by U.S. Shoe. The first of these two considerations was that U.S. Shoe and/or Prudential may have believed that *all* the charges made by Greenridge were for "room and board." *See supra* ¶¶ 36, 37.

The second consideration that may have played some role in the denial of benefits, at least in the lower levels of Prudential's review of Lancaster's claim, was an apparent belief, based on the definition of the word "convalescent," that "Extended Convalescent Care Benefits" could only be awarded for care that helped a patient progress toward recovery from an illness or injury, not care that only maintained a patient's condition. *See supra* ¶¶ 24–26. In addition to surfacing in telephone conversations between a Prudential claims representative and the conservator's attorney, *see supra* ¶¶ 24–25, this consideration appears to be present in part of Prudential's definition of "custodial care"— "[c]are that provides a level of routine *maintenance* for the purpose of meeting personal needs." *See supra* ¶ 26 (emphasis added).

In order to be thorough, we will rule on the validity of all four considerations that may have played a role in the decisions of Prudential and/or U.S. Shoe—both the two reasons that were given explicitly and the two reasons that may have played a role internally. We must now determine what standard to use to review the validity of the four considerations.

### B. *Doctrinal Overview/Abuse of Discretion Standard*

U.S. Shoe wishes the court to review the denial of benefits under only one standard—the "abuse of discretion" standard, also called the "arbitrary and capricious" standard. "A determination that denies benefits under an ERISA plan is reviewed de novo 'unless the

benefit plan gives the administrator or fiduciary discretionary authority to construe the terms of the plan.'" *Snow v. Standard Ins. Co.*, 87 F.3d 327, 330 (9th Cir.1996) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989)). "When discretion is conferred, the exercise of that discretion is reviewed under the arbitrary or capricious standard, or for abuse of discretion, which comes to the same thing." *Id.* (citing *Atwood v. Newmont Gold Co.*, 45 F.3d 1317, 1321 & n. 1 (9th Cir.1995)). " 'It is an abuse of discretion for an ERISA plan administrator to make a decision without any explanation, or in a way that conflicts with the plain language of the plan, or that is based on clearly erroneous findings of fact.'" *Id.* at 331 (quoting *Atwood*, 45 F.3d at 1323–24).

U.S. Shoe's Plan clearly confers discretionary authority to construe the terms of the Plan upon the Benefit Committee. The Plan gives the Benefit Committee authority to "interpret and construe this Plan . . . to determine all questions of eligibility . . . to determine the benefits payable . . . and to decide such questions as may arise in connection with the operation of this Plan." *See supra* ¶ 15. Thus, if our analysis were to proceed no further, it would appear that we should apply the abuse of discretion standard, not the *de novo* standard.

Plaintiff, however, argues that we should base our analysis on three far less deferential doctrines. The first of the three is the doctrine of *contra proferentem*, which can, in some circumstances, require ambiguous terms in a plan to be construed against an insurer and in favor of the insured. *See Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 539 (9th Cir.), *cert. denied*, 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 587 (1990). The second is the doctrine that where the summary description of a plan differs from the plan itself, the summary description controls. *See Atwood*, 45 F.3d at 1321. The third is the doctrine of reasonable expectations, which requires a plan to be interpreted in accordance with the reasonable expectations of the insured where the plan is ambiguous or where exclusionary provisions in a plan are not sufficiently conspicuous. *See*

*Saltarelli v. Bob Baker Group Medical Trust*, 35 F.3d 382, 385–87 (9th Cir.1984).

In sections that follow, we discuss each of these three doctrines in turn. We conclude, under controlling Ninth Circuit authority, that the doctrine of *contra proferentem* does not apply to the plan at issue here. *See infra* § III(C). Applying the doctrine that an SPD takes precedence over the plan itself where the two conflict, we rule that U.S. Shoe's and Prudential's denial of coverage on the basis that Lancaster had exhausted a 365–day limit on "Extended Convalescent Care Benefits" was invalid. *See infra* § III(D)(3). In our discussion of this point, we also conclude that, to the extent that U.S. Shoe and/or Prudential may have based their denial on the belief that *all* of the charges by Greenridge were for room and board, the denial constituted an abuse of discretion. *See infra* § III(D)(4). Finally, applying the reasonable expectations doctrine, we conclude that it was not permissible to deny Lancaster's claim on the grounds that the Plan does not provide coverage for extended care that can be provided by unskilled personnel or that is used to merely maintain a patient's condition. *See infra* § III(E).

## C. *Contra Proferentem*

 In some circumstances, the doctrine of *contra proferentem* requires ambiguities in insurance contracts to be construed against the drafter of the contract, which is normally the insurer. *See, e.g., Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 539 (9th Cir.), *cert. denied*, 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 587 (1990). However, in *Winters v. Costco Wholesale Corp.*, 49 F.3d 550, 554 (9th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 276, 133 L.Ed.2d 197 (1995), the Ninth Circuit held "that the rule of *contra proferentem* is *not* applicable to self-funded ERISA plans that bestow *explicit* discretionary authority upon an administrator to determine eligibility for benefits or to construe the terms of the plan." (Emphasis added.)

U.S. Shoe's Plan is self-funded, and it clearly gives the Benefit Committee discretion to construe the Plan. *See supra* ¶¶ 4, 15. Thus, it would seem that plaintiff should

have no argument that the doctrine of *contra proferentem* applies here. Plaintiff, however, presses an argument that it does apply. Focusing on the use of the word "explicit" by the *Winters* court, plaintiff contends that *Winters* requires a benefit plan to be especially "explicit" in granting *discretionary* authority to construe plan terms in order for *contra proferentem* not to apply to a self-funded plan.

We think that plaintiff is in error. First, even if *Winters* does require an unusually "explicit" conferral of discretion, we believe that the benefits plan at issue here is sufficiently explicit. As stated earlier, the Plan gives the Benefit Committee the "powers ... to interpret and construe this Plan ... *consistent with its terms and provisions* ... to determine all questions of eligibility ... to determine the benefits payable ... and to decide such questions as may arise in connection with the operation of this Plan." *See supra* ¶ 15 (emphasis added). Plaintiff emphasizes the language "consistent with its terms and provisions," contending that this language limits the Benefit Committee's authority "to interpret and construe this Plan." However, the language "consistent with its terms and provisions" still permits the Benefit Committee to construe the meaning of ambiguous terms and provisions.

Secondly, we do not agree with plaintiff's reading of *Winters*. We interpret *Winters* as holding that, at least for self-funded plans, the doctrine of *contra proferentem* does not apply where a plan grants the administrator the same level of discretionary authority that is sufficient for a court to conclude that the abuse of discretion standard of review applies instead of the *de novo* standard.

The main basis for this interpretation of *Winters* by us is a logical one—it appears to us that the abuse of discretion standard and the doctrine of *contra proferentem* are wholly at odds with each other. Under the abuse of discretion standard, a court is to defer to a plan administrator's interpretation of ambiguous plan terms. But under *contra proferentem*, a court is to construe ambiguous plan terms against the insurer. It seems that application of the *contra proferentem* doctrine does not leave much, if any, room for

plan administrators to exercise discretion in interpretation of ambiguous terms.

The Supreme Court held in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989), that the abuse of discretion standard applies where a plan provision gives the administrator discretionary authority to interpret the plan. In our view, it would make no sense to import into "abuse of discretion" review a principle, *contra proferentem*, that could threaten to render the abuse of discretion standard virtually meaningless. Moreover, as we will discuss below, there are other tools, such as the reasonable expectations doctrine, which, in appropriate circumstances, can be used to impose some limits on the plan administrator's discretion without wholly eviscerating the abuse of discretion standard.

Our conclusion that *Winters*, 49 F.3d at 554, does not require a plan to confer any unusually "explicit" discretionary authority on a plan administrator in order for the *contra proferentem* doctrine to be inapplicable also is supported by a careful examination of the development of Ninth Circuit authority dealing with the application of *contra proferentem* in ERISA cases. *Contra proferentem* in the ERISA context is discussed by three post-*Firestone* Ninth Circuit decisions—*Winters*, 49 F.3d 550; *Eley v. Boeing Co.*, 945 F.2d 276 (9th Cir.1991); and *Kunin*, 910 F.2d 534.

*Kunin*, 910 F.2d 534, is the earliest of the three cases and the most favorable for plaintiff here. Importantly, the Ninth Circuit's decision in *Kunin* came after *Firestone*, 489 U.S. 101, 109 S.Ct. 948, was decided, but the district court decision which the Ninth Circuit reviewed was issued before *Firestone*. *See Kunin*, 910 F.2d at 537. The district court in *Kunin* reviewed the plan interpretations at issue under the abuse of discretion standard, because before *Firestone* was decided, the abuse of discretion standard was applied to *all* ERISA benefits plans in the Ninth Circuit, not just to those that conferred discretion on the plan administrator. *See Kunin*, 910 F.2d at 536–37. *Kunin* strongly implies that the benefits plan at issue in *Kunin* did not have a provision

granting the administrator discretionary authority to interpret plan terms, as *Kunin* clearly suggests that it would have been correct for the district court to apply the *de novo* standard if it had reviewed the plan after *Firestone*. *See Kunin*, 910 F.2d at 537. However, in order to give the defendant the benefit of the doubt on an argument that it would have been improper for the appeals court to review the administrator's decision using a different standard than the one used by the district court, the *Kunin* panel applied the abuse of discretion standard. *See id.*

The *Kunin* court first held that the district court did not clearly err by concluding that the plan administrator's denial of benefits was arbitrary and capricious. *Id.* at 538. The *Kunin* court then held in favor of the insured on an alternative ground—the plan administrator failed to follow the doctrine of *contra proferentem*, which requires that ambiguous plan terms be construed in favor of the insured. *Id.* at 539. In reaching this conclusion, the court rejected the insurer's argument that *Firestone* made the doctrine of *contra proferentem* inapplicable in ERISA cases. *See Kunin*, 910 F.2d at 540–41.

The *Kunin* court relied on passages from *Firestone* to support its rejection of the insurer's argument. However, in the cited passages, the Supreme Court explains the proper way to apply *de novo* review, not abuse of discretion review. *See Kunin*, 910 F.2d at 541. Moreover, the *Kunin* court never had occasion to address the logical tension inherent in applying *contra proferentem* to a plan that grants the administrator discretionary authority to construe plan terms, because the plan at issue in *Kunin* apparently did not give the administrator such authority. Because of its unusual procedural circumstances, *Kunin* applied abuse of discretion review to a plan that apparently did not grant the administrator discretionary interpretive authority. Thus, it is not clear that *Kunin* squarely supports the conclusion that it is proper to apply *contra proferentem* where a plan grants the administrator discretionary authority to construe the terms of the plan. There is certainly no passage in *Kunin* that explicitly states such a holding.

In *Eley*, 945 F.2d at 279, the Ninth Circuit stated, in dicta, without a pinpoint citation, that "the *Kunin* court held that, if a term in an insurance contract is ambiguous, that term must be construed against the insurer even if the insurance contract is an 'employee welfare benefit plan' governed by ERISA and grants discretion to the administrator." The *Eley* court, however, refused to apply the *contra proferentem* doctrine. The plan at issue in *Eley* gave the administrator discretion to construe the provisions of the plan. The reasons given by the *Eley* court for not applying *contra proferentem*, however, were that, unlike the plan in *Kunin*, the plan in *Eley* was collectively bargained and was self-funded. *See Eley*, 945 F.2d at 280.

The plan in *Winters* was not collectively bargained, was self-funded, and gave the plan administrator discretion to interpret plan terms. *See* 49 F.3d at 554. The *Winters* court stated that "it is not proper to rely on [the *contra proferentem* ] principle where, as here, the Plan grants the fiduciary explicit discretion to interpret the Plan." *Id.* The court quoted *Kunin* for the proposition that "*contra proferentem* 'is based upon the principle of contract construction that when one party is responsible for the drafting of an instrument, *absent evidence indicating the intention of the parties*, any ambiguity will be resolved against the drafter.'" *Winters*, 49 F.3d at 554 (quoting *Kunin*, 910 F.2d at 539 (adding emphasis)). The court explained that "[t]he Plan ... states how Plan terms are to be interpreted, and the general rule of *contra proferentem* does not apply." *Winters*, 49 F.3d at 554.

In view of the history of the application of the *contra proferentem* doctrine to ERISA cases in the Ninth Circuit, we think that the main basis for the *Winters* holding was the doctrinal tension that would arise if courts applied *contra proferentem* to a plan containing a provision granting the administrator discretionary authority to interpret plan terms. The passages we cited from *Winters* were likely written to correct any incorrect impressions of the law that may have been created by the ambiguity in *Kunin* and the dicta in *Eley*.

Plaintiff would have us conclude that some plans do not give the plan administrator sufficiently "explicit" discretionary authority for the plan to qualify for immunity from the doctrine of *contra proferentem*, but do give sufficient discretionary authority for the plan to be subject to abuse of discretion review. We think that such an interpretation would be inconsistent with the spirit of *Winters*, and would give undue emphasis to the word "explicit" in *Winters'* statement of holding. Plaintiff's interpretation of the law would conflict with the desire to eliminate the potential inconsistency between the doctrine of *contra proferentem* and abuse of discretion review that seems to us to lie at the heart of *Winters*.

■ We thus conclude that *Winters* does not require a benefits plan, in order for the doctrine of *contra proferentem* to be inapplicable, to give the administrator discretionary interpretive authority through language that is more explicit than the kind of language that is sufficient to qualify an ERISA plan for abuse of discretion review in the Ninth Circuit. Since we have already decided that the language in the U.S. Shoe Plan would be sufficient, absent competing considerations, to trigger abuse of discretion review, as opposed to *de novo* review, we hold that the doctrine of *contra proferentem* is inapplicable in this case.

### D. Conflict Between the SPD and the Plan

#### 1. The Atwood Doctrine.

■ Under *Atwood v. Newmont Gold Co.*, 45 F.3d 1317, 1321 (9th Cir.1995), where an SPD and a plan conflict in their descriptions of the circumstances which may result in a denial of benefits, the SPD controls over the plan. We shall henceforth call this doctrine the "*Atwood* doctrine." In *Atwood*, the Ninth Circuit stated that "ERISA requires that the SPD explain the 'circumstances which may result in disqualification, ineligibility, or denial or loss of benefits.'" *Id.* (quoting 29 U.S.C. § 1022(b)). The court added that the Ninth Circuit has "interpreted § 1022(b) to mean that the SPD 'must be specific enough to enable the ordinary employee to sense when there is a danger that

benefits could be lost or diminished.'" *Id.* (quoting *Stahl v. Tony's Bldg. Materials, Inc.*, 875 F.2d 1404, 1408 (9th Cir.1989)). The court stated, "Where the SPD fails to meet this requirement and differs materially from the terms of the plan, the SPD is controlling." *Id.* (citing *Arnold v. Arrow Transp. Co. of Del.*, 926 F.2d 782, 785 n. 3 (9th Cir.1991)).

The Ninth Circuit's adoption of the principle that an SPD controls over a plan where the two conflict followed some vacillation about the issue on the part of the appellate court. In *Arnold*, 926 F.2d at 785 n. 3, the Ninth Circuit cited, with apparent approval, *Edwards v. State Farm Mut. Auto Ins. Co.*, 851 F.2d 134, 136 (6th Cir.1988), for the proposition that "summary plan statements are binding," and two district court cases, *Kochendorfer v. Rockdale Sash & Trim Co. Profit Sharing Plan*, 653 F.Supp. 612, 614 (N.D.Ill.1987), and *Gors v. Venoy Palmer Market, Inc.*, 578 F.Supp. 365, 368 (E.D.Mich.1984), for the proposition that "challenges to a plan can be based on [a] summary plan description and such a summary may modify the terms of the plan." However, in *Long v. Flying Tiger Line, Inc. Fixed Pension Plan for Pilots*, 994 F.2d 692, 695 & n. 1 (9th Cir.1993), the Ninth Circuit stated that it had not yet decided the issue of whether an SPD takes precedence over policy documents if the two conflict, and denied that *Arnold* had adopted the holding in *Edwards*, 851 F.2d at 136, that the SPD is binding on the insurer. Then, in an opinion published less than three months after *Long*, *Price v. Provident Life & Acc., Ins. Co.*, 2 F.3d 986 (9th Cir.1993), the Ninth Circuit stated, in dicta in a footnote, that "the [provision at issue] is part of the plan summary, the terms of which are binding on [the insurer] and which govern if the summary conflicts with the policy." *Price*, 2 F.3d at 988 n. 1 (citing *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 982 (5th Cir.1991)).

Despite the Ninth Circuit's initial vacillation, we think that the clear statement in *Atwood*, 45 F.3d at 1321, leaves no room for doubting that the Ninth Circuit has adopted what we call the "*Atwood* doctrine."

### 2. Is Reliance Required Under the Atwood Doctrine?

■ One issue that *Atwood* does not explicitly discuss is whether, in order for the terms of the SPD to supersede the plan under the *Atwood* doctrine, a plaintiff is required to show that he relied on the SPD. Other circuits have split on this issue. The Second, Fifth, and Sixth Circuits have held that reliance is not required. *See Hansen,* 940 F.2d at 982; *Heidgerd v. Olin Corp.,* 906 F.2d 903, 907–08 (2d Cir.1990); *Edwards,* 851 F.2d at 136–37. The First, Third, Seventh, and Eleventh Circuits, on the other hand, have held that reliance is required. *See Branch v. G. Bernd Co.,* 955 F.2d 1574, 1579 (11th Cir.1992); *Senkier v. Hartford Life & Accident Ins. Co.,* 948 F.2d 1050–51 (7th Cir.1991); *Gridley v. Cleveland Pneumatic Co.,* 924 F.2d 1310, 1319 n. 8 (3d Cir.), *cert. denied,* 501 U.S. 1232, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991); *Bachelder v. Communications Satellite Corp.,* 837 F.2d 519, 522–23 (1st Cir.1988).

Three district court decisions within the Ninth Circuit hold that reliance is required for an SPD to take precedence over underlying plan documents. *See Adams v. J.C. Penney Co.,* 865 F.Supp. 1454, 1459–60 (D.Or. 1994), *aff'd mem.,* 83 F.3d 426 (9th Cir.1996); *Kaiser Permanente Employees Pension Plan v. Bertozzi,* 849 F.Supp. 692, 698 (N.D.Cal.1994); *Berry v. Blue Cross of Washington & Alaska,* 815 F.Supp. 359, 364–65 (W.D.Wash.1993). However, relying mainly on authority published after these three district court decisions were issued, we respectfully disagree with the three decisions, and hold that reliance is not required under the *Atwood* doctrine.

The first reason for our conclusion that reliance is not required under the *Atwood* doctrine is that the Ninth Circuit Court of Appeals decisions favoring the doctrine do not appear to support including a reliance requirement in the doctrine. *Atwood,* 45 F.3d at 1321, which was decided after *Adams, Kaiser,* and *Berry,* and which was the first Ninth Circuit case to clearly adopt the doctrine that an SPD takes precedence over separate policy documents, says nothing about a reliance requirement. The two earlier Ninth Circuit cases that appeared to favor the adoption of the *Atwood* doctrine, *Price,* 2 F.3d at 988 n. 1, and *Arnold,* 926 F.2d at 785 n. 3, also do not mention a reliance requirement. Moreover, the two cases from other circuits cited with approval by *Price* and *Arnold* for the proposition that an SPD supersedes a conflicting plan, *Hansen,* 940 F.2d at 982, and *Edwards,* 851 F.2d at 136–37, both hold that reliance is *not* required.

The second and strongest reason supporting our conclusion that reliance is not required under the *Atwood* doctrine is that such a requirement would not make sense in view of the Ninth Circuit's adoption of the reasonable expectations doctrine in *Saltarelli v. Bob Baker Group Medical Trust,* 35 F.3d 382 (9th Cir.1994). *Saltarelli* was decided after the three district court decisions which favor a reliance requirement.

■ The reasonable expectations doctrine requires an ERISA benefits plan to be interpreted in accordance with the reasonable expectations of the insured. *See Saltarelli,* 35 F.3d at 386–87. A prerequisite for application of the reasonable expectations doctrine is that the plan must be ambiguous or an exclusionary provision in the plan must not be sufficiently conspicuous. *See infra* § III(E)(3); *Peterson v. American Life & Health Ins. Co.,* 48 F.3d 404, 411 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 377, 133 L.Ed.2d 301 (1995); *Krishan v. McDonnell Douglas Corp.,* 873 F.Supp. 345, 353 n. 7 (C.D.Cal.1994). When there is both an SPD and separate, underlying policy documents, the authorities suggest (and we conclude below) that it is correct to examine the SPD, not the separate policy documents, in determining whether the reasonable expectations doctrine is applicable (and in applying the doctrine). *See infra* § III(E)(3); *Saltarelli,* 35 F.3d at 385.

The reasonable expectations doctrine examines "*objectively* reasonable expectations of coverage." *See Saltarelli,* 35 F.3d at 387 (emphasis added). There is absolutely no allusion to the insured's actual state of mind or to "reliance" in any of the decisions by courts within the Ninth Circuit that apply or discuss the reasonable expectations doctrine. *See, e.g., McClure v. Life Ins. Co. of North*

*America,* 84 F.3d 1129, 1135–36 (9th Cir. 1996); *Saltarelli,* 35 F.3d at 385–87; *Henry v. Home Ins. Co.,* 907 F.Supp. 1392, 1396–97 (C.D.Cal.1995). Thus, the available decisional law strongly supports a conclusion that there is no reliance element under the reasonable expectations doctrine as applied to ERISA plans by the Ninth Circuit.

It would be anomalous, at best, to impose a reliance requirement under the *Atwood* doctrine but to impose no such requirement under the reasonable expectations doctrine. The *Atwood* doctrine applies where the SPD unambiguously conflicts with the plan; the reasonable expectations doctrine applies where the SPD is ambiguous or contains an insufficiently conspicuous exclusion. Certainly, courts should be more willing to disregard underlying plan documents where the plan clearly conflicts with the SPD than where the plan only conflicts with reasonable expectations based on an ambiguous SPD or where exclusions in an SPD are insufficiently prominent. Yet adopting a reliance requirement under the *Atwood* doctrine but not under the reasonable expectations doctrine would produce precisely the opposite result— it would become more difficult for a clear SPD to supersede a conflicting plan than for an ambiguous SPD to do the same!

Our conclusion about this issue is further bolstered by policy considerations. Using a wholly objective test, instead of one with a possibly subjective reliance element, to determine whether an SPD overrides a plan should lead insureds and insurers to have clearer expectations about the likely outcomes of disputes, reducing litigation incentives and costs. It also should encourage insurers to make sure SPDs clearly reflect plan exclusions, benefitting all persons covered by ERISA plans, and promoting the full flow of information essential to the efficient functioning of our free market system. In addition, a reliance requirement would make it harder for courts to decide ERISA controversies on summary judgment, since there will frequently be factual disputes over whether the plaintiff actually relied on the SPD, which will cause litigation costs to rise and use up scarce judicial resources. For all these reasons, we conclude that there is no "reliance" requirement under the *Atwood* doctrine.

### 3. *Application of the Atwood Doctrine.*

■ We now proceed to apply the *Atwood* doctrine to the facts of this case.[2] One of the reasons given by U.S. Shoe and Prudential for their denial of Lancaster's claim was that Lancaster had exhausted a 365–day limit on "Extended Convalescent Care Benefits." *See supra* ¶¶ 35, 39. The Plan itself has a clear 365–day limit on payment of convalescent care benefits arising out of one injury or illness. *See supra* ¶ 16.[3]

However, the SPD[4] only states that there is a $6,570 limit on *room and board* benefits under "Extended Convalescent Care Benefits." The "Extended Convalescent Care Benefits" section of the SPD states that the Plan covers "[r]oom and board provided by the Facility except any charge that exceeds that Daily Room and Board Benefit of $18 to

---

**2.** While we have decided that reliance is not required under the *Atwood* doctrine, we note that there is significant circumstantial evidence in the record that the conservator relied on the SPD. There was considerable communication between Prudential and the conservator's attorney about what the benefits to which Lancaster was entitled under the Plan were before the conservator enrolled Lancaster in the retiree plan. Some of this communication mentioned the 1990 SPD. *See supra* ¶¶ 20–22. However, because the parties have not discussed the reliance issue or presented evidence directly addressing the issue, we cannot determine on summary judgment whether the conservator relied on the SPD.

**3.** The parties appear to disagree about whether Lancaster was covered under the Plan section entitled "Convalescent Nursing Home Care Provisions Under Major Medical Expense Benefits" or under the Plan section entitled "Convalescent Nursing Home Expense Benefit Provisions Under Hospital Expense Benefits." However, the 365–day limit clearly appears in both sections. More generally, the two sections, for the most part, use identical language, and the two sections do not have any material differences relevant to this case. *See supra* ¶¶ 16–17.

**4.** We rely on the 1990 SPD in this discussion. In a later section, we explain in detail why it is correct to use the 1990 SPD to analyze the validity of U.S. Shoe's denial of coverage. *See infra* § III(E)(4).

a maximum of $6,570 per disability." [5] *See supra* ¶ 7. The SPD then lists six other categories of coverage, such as coverage for "[r]outine nursing care," in the "Extended Convalescent Care Benefits" section, but does not set any kind of durational or monetary limit for benefits under those categories. *See supra* ¶ 7. Nor does any other section of the SPD set any monetary or durational limits on "Extended Convalescent Care Benefits." [6] The only reasonable interpretation of the SPD is that a $6,570 limit is set *only* on room and board and that the *only* cap on the other benefits is the $1,000,000 overall limit.

It follows that the SPD and the Plan conflict. For this reason, we hold that the 365–day limit on convalescent care benefits that is articulated only in the Plan itself is unenforceable. U.S. Shoe may enforce the 365–day limit only with respect to *room and board* benefits.

### 4. *Validity of Possible Denial of Coverage on Basis that all Greenridge Charges Were for Room and Board.*

There are some indications in the administrative record that the denial of Lancaster's claim may have been in part based on a belief by Prudential and/or U.S. Shoe that *all* the Greenridge charges were charges for "room and board." *See supra* ¶¶ 36–37. If U.S. Shoe and/or Prudential reached such a conclusion, this was an abuse of discretion. The administrative record clearly indicates that Greenridge provided services to Lancaster other than "room and board." Greenridge certainly provided Lancaster with "routine nursing services," as Lancaster needs assistance with virtually all his daily living activities. *See supra* ¶¶ 28–32. Thus, if U.S.

Shoe concluded that Lancaster was, as a matter of historical fact, getting only "room and board" at Greenridge, this was a clearly erroneous finding of fact.

If U.S. Shoe interpreted the term "room and board" as covering services such as nursing services, or covering "custodial" nursing services, this was an unreasonable interpretation of both the Plan and the SPD. Both the Plan and the SPD, in their convalescent care benefits sections, list *separately* coverage for "room and board," and for six other categories, such as "routine nursing care" and "physical or speech therapy." *See supra* ¶¶ 7, 16. The only reasonable interpretation of the convalescent care benefits sections is that "room and board" does not include the services and supplies discussed in the six other categories, such as "routine nursing care." [7]

Thus, to the extent that U.S. Shoe and/or Prudential may have treated *all* the Greenridge charges as "room and board" charges, this was an abuse of discretion. On remand, U.S. Shoe may not treat all the charges for Lancaster's confinement at Greenridge as "room and board" charges. We realize, however, that U.S. Shoe and Prudential may have legitimate concerns about whether the $18 per day for room and board that Greenridge billed fairly reflected the actual cost of those two components of Lancaster's residency there. At the conclusion of this opinion, we will give U.S. Shoe instructions about how to deal on remand with the potentially difficult issue of determining what proportion of Greenridge's charges is fairly allocable to room and board and what proportion is fairly allocable to services and supplies other than room and board. *See infra* § IV.[8]

---

**5.** 365 multiplied by $18 is $6,570. Thus, the SPD limits *room and board* benefits to 365 days.

**6.** The only monetary or durational limit on extended care benefits other than room and board benefits is the provision that sets a $1,000,000 ceiling on overall lifetime benefits. *See supra* ¶ 6.

**7.** In addition, "room and board" is defined by Webster's Third New International Dictionary (1993) as "food and lodging."

**8.** There is another provision in the Plan which conflicts with the SPD. The last of the seven

categories for which the Plan's convalescent care benefits sections provide coverage is "other services and supplies, *exclusive of professional services,* furnished by the Convalescent Nursing Home for medical care therein." *See supra* ¶ 16 (emphasis added). The last of the seven categories for which benefits are provided that is listed in the "Extended Convalescent Care Benefits" section of the SPD, however, is "such other services necessary to the health of the patients as generally provided by the Facility." *See supra* ¶ 7. The SPD contains no exclusion for "professional services."

## E. Reasonable Expectations

### 1. The Doctrine.

██ The leading Ninth Circuit case on the application of the reasonable expectations doctrine to ERISA benefits plans is *Saltarelli v. Bob Baker Group Medical Trust*, 35 F.3d 382 (9th Cir.1994). In *Saltarelli*, the Ninth Circuit explicitly adopted "the doctrine of reasonable expectations as a principle of the uniform federal common law informing interpretation of ERISA-governed insurance contracts." *Id.* at 387. Under the reasonable expectations doctrine, where "attempted exclusion[s]" in an insurance policy are "not clear, plain, and conspicuous enough to negate [a] layman['s] ... objectively reasonable expectations of coverage," they are "unenforceable." *See id.* at 387.

Explaining the doctrine, the court stated:

In general, courts will protect the reasonable expectations of applicants, insureds, and intended beneficiaries regarding the coverage afforded by insurance carriers even though a careful examination of the policy provisions indicates that such expectations are contrary to the expressed intention of the insurer.

*Id.* at 386 (quoting Robert E. Keeton & Alan I. Widiss, *Insurance Law: A Guide to Fundamental Principles, Legal Doctrines, and Commercial Practices* § 6.3 (West 1988)). The court added:

[A]n insurer wishing to avoid liability on a *policy purporting to give general or comprehensive coverage* must make exclusionary clauses conspicuous, plain, and clear, placing them in such a fashion as to make obvious their relationship to other policy terms, and must bring such provisions to the attention of the insured.

*Id.* at 386 (quoting *National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488, 496 (1987)) (emphasis added).

The court in *Saltarelli* held that a plan exclusion which denied coverage for pre-existing conditions was unenforceable because it was insufficiently conspicuous. *See id.* at 385–87. The exclusion was not clear and prominent, but was buried in a definitional section of the plan description. *See id.* at 385.

Another case applying the reasonable expectations doctrine to an ERISA plan is *Henry v. Home Ins. Co.*, 907 F.Supp. 1392 (C.D.Cal.1995). The *Henry* court stated that "[t]he purpose of the doctrine is to protects insureds['] 'objectively reasonable expectations of coverage.'" *Id.* at 1396 (quoting *Winters v. Costco Wholesale Corp.*, 49 F.3d 550, 555 (9th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 276, 133 L.Ed.2d 197 (1995)). In *Henry*, the court refused to enforce an insurance policy clause which, if read literally, would have denied coverage for injuries or illnesses related to an accident if any pre-existing condition contributed to the injuries or illnesses.

The court stated that, under the reasonable expectations doctrine, "[w]here particular provisions, if read literally, would largely nullify the insurance [coverage reasonably expected], they will be severely restricted so as to enable fair fulfillment of the stated [insurance] policy objective." *Id.* at 1397 (quoting *Kievit v. Loyal Protective Life Ins. Co.*, 34 N.J. 475, 170 A.2d 22, 25–26 (1961)). The *Henry* court held the policy provision at issue to be unenforceable, explaining that "literal application of the [provision] would defeat the purpose of accident insurance for all but the healthiest of people." *Id.* at 1397. *Henry* was cited with approval and followed by the Ninth Circuit in *McClure v. Life Ins. Co. of North America*, 84 F.3d 1129, 1135–36 (9th Cir.1996).

*Saltarelli* and *Henry* demonstrate that the reasonable expectations doctrine prohibits an insurance policy exclusion from being enforced where, even if the exclusion is unam-

The exclusion for "professional services" does not appear to be at issue in the motion before us. However, for purposes of judicial economy, we rule now that, on remand, U.S. Shoe may not enforce the exclusion for "professional services." The reason for this ruling is that the SPD and the Plan conflict with regard to the Plan's exclusion for "professional services," and the SPD, which has no exclusion for "professional services," controls. Of course, as stated in the SPD, U.S. Shoe will not have to pay benefits for "professional services" if the services are not "necessary to the health of the patients."

biguous, it is insufficiently conspicuous, or where, if the exclusion is ambiguous, it would defeat the primary overall purpose of the insurance. As we shall see shortly, the situation in the instant case is somewhat different. The "custodial care" exclusion that U.S. Shoe and Prudential relied on is not just inconspicuous—it does not directly appear in the Plan or the SPD at all. The "custodial care" exclusion is purportedly derived by U.S. Shoe and Prudential from the exclusions in the Plan and SPD for services that are not "reasonably" or "medically" "necessary." *See supra* ¶¶ 34, 39. We explain below that we find that the clause excluding services and supplies that are not "necessary" is ambiguous. *See infra* § III(E)(5). Does the reasonable expectations doctrine apply where the exclusion upon which the insurer relies does not explicitly appear in the policy at all but is (at least arguably) based on an interpretation of an ambiguous term?

While we have not located any Ninth Circuit cases addressing this issue, we think that the doctrine must apply in such a situation. First, it would not make sense for the doctrine to be applicable where an exclusion is fairly clear but is insufficiently conspicuous, as in *Saltarelli*, 35 F.3d at 385–87, but not where it cannot be found in the policy at all, or where it is based only on a questionable interpretation of a policy term that does not clearly suggest the exclusion.

Second, there is supporting authority more analogous to the situation in the case at bar outside the Ninth Circuit. *McConocha v. Blue Cross & Blue Shield of Ohio*, 898 F.Supp. 545, 549 (N.D.Ohio 1995), though decided by an Ohio district court, cited solely Ninth Circuit authority (*Saltarelli*, 35 F.3d at 385–87, and *Peterson v. American Life & Health Ins. Co.*, 48 F.3d 404, 411 (9th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 377, 133 L.Ed.2d 301 (1995)) to support its application of the reasonable expectations doctrine in an ERISA case. *McConocha* stands for the proposition that an insurer's reason for denying payment is invalid where it conflicts with the reasonable expectations of the insured and cannot be found in the policy at all, though the reason is based on an arguably rational interpretation of an ambiguous policy provision.

The policy description at issue in *McConocha* stated that the insurer was responsible for eighty percent of charges and that the insured was responsible for a twenty percent co-pay. The insurer in the case negotiated "discount agreements" with certain hospitals which provided that the hospitals would receive from the insurer less than eighty percent of the total amount billed to the patients. In other words, the patient would pay twenty percent of a bill, and the insurer would pay the hospital some discounted amount smaller than the remaining eighty percent. The hospital would thus receive less than the total amount of the bill, meaning that the insured would end up paying more than twenty percent of the amount the hospital actually received. *See McConocha*, 898 F.Supp. at 547.

The court in *McConocha* held that the policy at issue there was ambiguous, and that the policy was "fairly susceptible" to the insurer's interpretation of it. *Id.* at 548. However, nothing in the policy made any mention of the "discount agreements" or warned the insured in any way about the possibility of such agreements. *See id.* at 549. The court therefore held that the reasonable expectations doctrine required the insured to pay twenty percent of the amount *actually received* by the hospital (as opposed to twenty percent of the amount originally billed, which was often higher than the amount actually received), as that "was the only expectation the plaintiffs could have had." *Id. McConocha* thus applied the reasonable expectation doctrine in a situation where the "exclusion" the insurer relied on did not appear in the policy at all but was not barred by the policy's explicit terms.

## 2. Is the Reasonable Expectations Doctrine Applicable to a Plan Conferring Discretionary Interpretive Authority on the Plan Administrator?

■ In our discussion of the *contra proferentem* doctrine, we determined that it would be logically inconsistent to apply the doctrine to a plan which conferred discretion upon the administrator to construe plan

terms and which therefore was subject to abuse of discretion review. *See supra* § III(D). Can the same argument be made about the application of the reasonable expectations doctrine to a plan subject to abuse of discretion (as opposed to *de novo*) review? Would interpreting benefit plans in accordance with the reasonable expectations of insureds tend to leave little room for plan administrators to exercise their discretion over construing plan terms? We think that it is proper to apply the reasonable expectations doctrine to ERISA plans which give the administrator interpretive discretion, principally for two reasons.

First, *Saltarelli*, 35 F.3d 382, and *Henry*, 907 F.Supp. 1392, support the conclusion that the reasonable expectations doctrine is applicable whether or not the plan gives the administrator discretionary authority to construe plan terms. In *Saltarelli*, after the court concluded that the reasonable expectations doctrine barred enforcement of the policy exclusion at issue, the court stated, in a footnote, that its ruling "obviate[d] the need to reach the matter, hotly debated in the parties' briefs, of the . . . plan administrator's interpretation of the scope of the exclusion." *Id.* at 387 n. 9.

It is unlikely that the plan administrator's interpretation of the exclusion would have been "hotly debated" unless either the plan at issue was subject to review under the abuse of discretion standard, or there was a dispute over whether the abuse of discretion standard or the *de novo* standard applied. This suggests that the *Saltarelli* court applied the reasonable expectations doctrine to an ERISA plan which was either subject to review under the abuse of discretion standard or arguably subject to review under that standard.

*Henry*, 907 F.Supp. 1392, is clearer on this point than *Saltarelli*. In *Henry*, the court applied the reasonable expectations doctrine to a plan after explicitly ruling that the plan gave discretion to the plan administrator to determine eligibility for benefits under the plan. *See* 907 F.Supp. at 1395–97.

The second basis for our conclusion that the reasonable expectations doctrine is applicable to an ERISA plan that gives the administrator discretionary authority to interpret plan terms is that, unlike the *contra proferentem* doctrine, the reasonable expectations doctrine would not threaten to make the administrator's discretionary authority meaningless in all situations where a plan's terms are ambiguous. The reason for this is that, in order for the reasonable expectations doctrine to determine how an ambiguity should be construed, the insured must first demonstrate an affirmative basis in the benefit plan for the proffered reasonable expectations of coverage. There may be instances in which a plan is so ambiguous, or an insured's situation is so unforeseeable, that the insured will not be able to show that language in the SPD or other plan documents gives rise to *any* reasonable expectations of coverage. Thus, while the doctrine of reasonable expectations will certainly reduce the extent to which an administrator's exercise of interpretive discretion is given free reign, the reasonable expectations doctrine will not, unlike the *contra proferentem* doctrine, threaten to make that discretion utterly meaningless.

We think that the interpretation of the law at which we have arrived properly balances competing policy considerations. On the one hand, barring the application of the *contra proferentem* doctrine to self-funded plans that confer interpretive discretion upon the administrator advances goals of reducing insurance premium costs and incentives for litigation, and prevents evisceration of the abuse of discretion standard. On the other hand, application of the reasonable expectations doctrine to the same plans promotes the goal of giving insurers sufficient incentives to clearly communicate meanings of policy clauses and exclusions to insureds and the goal of preventing insurers and employers from taking unjustified advantage of the control that they may have over the terms of a benefit plan.

### 3. Should a Court Focus on an SPD or on Underlying Policy Documents in Determining Whether to Apply, and in Applying, the Reasonable Expectations Doctrine?

Having concluded that the reasonable expectations doctrine does apply to

ERISA benefit plans which give discretionary authority to construe plan terms to the plan administrator, we must answer a few more preliminary questions before we reach the meat of our reasonable expectations analysis. In order for the reasonable expectations doctrine to be applicable, a provision in a benefits plan must either be ambiguous or insufficiently conspicuous. *Peterson v. American Life & Health Ins. Co.*, 48 F.3d 404, 411 (9th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 377, 133 L.Ed.2d 301 (1995); *see also Krishan v. McDonnell Douglas Corp.*, 873 F.Supp. 345, 353 n. 7 (C.D.Cal. 1994).[9] If there is both an SPD and a separate set of documents constituting the benefits "plan," must the ambiguity or insufficiently conspicuous clause be in the SPD or the plan itself for the reasonable expectations doctrine to apply?

■ Answering this question will be easier if we first answer a related question: When determining the reasonable expectations of an insured, should a court look to the SPD or the plan itself, if the two are separate documents? We think that the answer must be the SPD, since the whole purpose of the reasonable expectations doctrine is to protect the reasonable expectations of coverage held by insureds. *See Henry*, 907 F.Supp. at 1392. Where an SPD is provided to an insured, it is highly unlikely that the insured will then obtain and carefully analyze the underlying policy documents, even where the SPD mentions the existence of such separate policy documents. Thus, it is the SPD,

not the underlying plan documents, that will normally be the source of insureds' reasonable expectations of coverage. Since it is the SPD that should be analyzed when applying the reasonable expectations doctrine, it would be anomalous to require an ambiguous or insufficiently conspicuous plan provision in underlying policy documents instead of only in the SPD as a prerequisite to applying the reasonable expectations doctrine.

*Saltarelli*, 35 F.3d 382, also points to the conclusion that the SPD, not the underlying plan documents, should be examined in applying the reasonable expectations doctrine and in deciding whether there exists an ambiguity or an insufficiently conspicuous clause that would permit application of the doctrine. A careful reading of *Saltarelli* reveals that the court was discussing an SPD, and not underlying policy documents, in finding an insufficiently conspicuous exclusion and applying the reasonable expectations doctrine. *See* 35 F.3d at 385.[10] We therefore conclude that, where there are separate policy documents and an SPD, a court should look to the SPD both for the threshold determination of whether there is an ambiguity or insufficiently conspicuous exclusion and for the source of the insured's reasonable expectations.

### 4. *Which SPD Controls?*

■ Before we can determine whether an ambiguity or insufficiently conspicuous exclusion exists and before we can apply the reasonable expectations doctrine, we must first

9. If an insurer's denial of coverage conflicts with the reasonable expectations of an insured, and the plan is not ambiguous, and the denial is not based on an insufficiently conspicuous exclusion, then application of the reasonable expectations doctrine cannot be necessary to resolve the controversy. In such a situation, the insurer's interpretation would either be in conflict with the plain terms of a plan, and thus would be an abuse of discretion, or would be based on a policy provision that conflicts with the plain terms of an SPD, and would be void under the *Atwood* doctrine.

10. The relevant text in *Saltarelli* is the following:
The Baker Group *Summary Plan Description*, which was provided to participants such as Saltarelli, covers 43 pages in single-spaced typescript....

Among the Baker Group plan provisions is an exclusion for "pre-existing conditions." However, an insured reading the table of contents of the *plan summary* would find no heading for this critically important item. ...
Instead, the exclusion can be found only in the midst of the "Definitions" chapter. Even then, it requires a coordinated reading of three separate definitions: those for "Pre–Existing Condition," "Illness," and "Injury."[4] ... Baker Group chose to bury one of the plan's most significant provisions amidst definitions, rather than forthrightly stating the pre-existing conditions exclusion in the operative clauses of the *plan description*.
*Saltarelli*, 35 F.3d at 385 (emphasis added).

4. Section II.B., "Medical Definitions," begins on page 7 of the *plan summary* and reads ...

determine which SPD to analyze—the 1984 SPD, the 1990 SPD, or the 1991 SPD? Lancaster's accident took place on December 15, 1988, *see supra* ¶ 1, before the 1990 SPD went into effect. However, after U.S. Shoe gave Lancaster the status of a retired employee due to his disability, Lancaster was required to enroll in a benefits plan for retirees in order to continue his coverage. *See supra* ¶¶ 12, 21. Lancaster's conservator enrolled him in the retiree plan on July 20, 1990, when the 1990 SPD was in effect and before the 1991 SPD went into effect, and paid premiums so that Lancaster could maintain coverage under the retiree plan. *See supra* ¶ 21. In order to determine whether to enroll Lancaster in the retiree plan, Lancaster's conservator's attorney examined the 1990 SPD and corresponded with U.S. Shoe about the 1990 SPD. *See supra* ¶¶ 20–22. Thus, the 1990 SPD is the appropriate source of the reasonable expectations of coverage of Lancaster's conservator.

Even though the 1991 SPD did not go into effect until after the conservator enrolled Lancaster in the retiree plan, an argument can be made that since the decisions by Prudential and U.S. Shoe at issue in this case were made after the 1991 SPD went into effect, the 1991 SPD should be treated as the source of the insured's reasonable expectations. While we are not inclined to accept such an argument, we note that it does not matter whether we use the 1990 SPD or 1991 SPD in deciding this motion. The two SPDs are very similar. The only difference between the two SPDs that might be relevant to our analysis is that the 1990 SPD excludes from coverage "services and supplies not *reasonably* necessary," while the 1991 SPD excludes "services and supplies not *medically* necessary." *See supra* ¶ 14 (emphasis added). However, the definitions of "reasonably necessary" and "medically necessary" in the 1990 SPD and 1991 SPD are nearly identical, without any material differences relevant to this motion. *See supra* ¶¶ 9, 14.

Nonetheless, in order to give defendant the benefit of the doubt on the issue of whether it is correct to focus on the 1990 SPD instead of the 1991 SPD, we will proceed as follows. We will, in applying the reasonable expectations doctrine, treat the SPD as if it excluded coverage both for services and supplies that are not "reasonably necessary" and for services and supplies that are not "medically necessary." However, we will focus on the common definition of "reasonably necessary" and "medically necessary," instead of the terms themselves in isolation, in interpreting the meaning of "reasonably necessary" and "medically necessary," for the definition is much more detailed than the terms themselves. In discussing the other provisions of the SPD, we will cite the 1990 SPD, for clarity, as there are no material differences between the 1990 SPD and the 1991 SPD with respect to these other provisions.

### 5. *Is the SPD Ambiguous?*

 We must now determine whether the SPD contains an ambiguity or an insufficiently conspicuous exclusion that would permit application of the reasonable expectations doctrine. Recall that one of U.S. Shoe's and Prudential's grounds for denial of coverage was that the care Lancaster received at Greenridge was "custodial," and, hence, not "medically necessary" or "reasonably necessary." *See supra* ¶¶ 34, 39. Recall further that the main basis upon which U.S. Shoe and Prudential distinguished "custodial" care from "necessary" care was that "custodial" care could be given by unskilled personnel, but that there were also some indications that U.S. Shoe and/or Prudential further distinguished "custodial" from "necessary" care on the basis that "custodial" care was care that only maintained a patient's condition (as opposed to care that was intended to improve or that actually improved the patient's condition). *See supra* ¶ 26; *see also supra* ¶¶ 24, 25.

The relevant part of the definition of "reasonably necessary" or "medically necessary" is that the "service or supply must ... be commonly and customarily recognized throughout the doctor's profession as appropriate in the *treatment* of the diagnosed *sickness or injury.*" *See supra* ¶ 9 (emphasis added). We conclude that is ambiguous whether "treatment of ... sickness or injury" encompasses care that can be adminis-

tered by unskilled personnel and/or care that only maintains a condition. The exclusion for care that is not "reasonably" or "medically" "necessary" does not unambiguously exclude from coverage care that is "custodial." A reasonable argument can be made that "treatment of . . . sickness or injury" encompasses care that is "custodial," as defined by U.S. Shoe. It can be argued that certain basic kinds of medical "treatment" can be administered without any specialized skills or training, and that services or supplies designed only to prevent a patient's condition from further deteriorating constitute "treatment" of the condition.[11]

### 6. Reasonable Expectations of the Insured.

 Having answered all preliminary questions, we finally reach the heart of this case: Would an insured, after reading the SPD, reasonably expect to be covered if he were to find himself in the situation Lancaster is in? We realize, of course, that most insureds would probably not, upon reading the SPD, independently consider the scenario that enveloped Lancaster. However, for the reasonable expectations doctrine to be meaningful, we believe that the proper way to think about reasonable expectations is this: If asked about the scenario at issue, would a reasonable insured, after examining the SPD, have an objectively based reasonable expectation of coverage?

 To determine what the reasonable expectations of an insured would be with regard to the type of situation Lancaster is in, we begin with an examination of the general goals and purposes of U.S. Shoe's benefits plan. The SPD has a very important introductory provision, which states:

> The Health Care plan provides protection against expenses you and your dependents may incur due to *illness or injury*. The choices which are available vary in the portion of the expenses you are required to pay. *All the choices, however, protect you*

*from the [sic] financial ruin due to a catastrophic condition.*

*See supra* ¶ 6 (emphasis added). The SPD defines "Illness" as a "[b]odily disorder or accidental injury or mental infirmity." *See supra* ¶ 8. The SPD also states that a "one million dollar lifetime cap has been placed on health care benefits for each person covered." *See supra* ¶ 6.

Thus, the reasonable expectations fostered by the SPD are that the Plan protects insureds from "financial ruin" if they suffer a "catastrophic" injury or "illness," which is broadly defined as a "[b]odily disorder or accidental injury or mental infirmity." The million-dollar cap supports the expectation that the Plan will take care of an insured if he suffers an injury or illness that requires very expensive and/or long-term treatment or care, as it suggests that the insurer is prepared to pay out any amount that is less than a million dollars. As in *Saltarelli*, we clearly have "a policy purporting to give general or comprehensive coverage." *See* 35 F.3d at 386.

The specific expectations of coverage a reasonable insured would have if presented with Lancaster's situation would be based mainly on the "Extended Convalescent Care Benefits" section. Fully quoted in the "Facts" part of this opinion, that SPD section provides, in relevant part:

> In order for any expenses to be covered, confinement in the *Facility* must start within 14 days following discharge from a hospital confinement of a minimum of three consecutive days. If necessary and reasonable, the following expenses are covered:
>
> 1. Room and board provided by the *Facility* except any charge that exceeds the Daily Room and Board Benefit of $18 to a maximum of $6,570 per disability.
>
> 2. Routine nursing care. . . .
>
> 3. Physical or speech therapy. . . .

---

11. Our conclusion would not change if we were required to look to the terms of the Plan itself, instead of the SPD, in determining whether there was an ambiguity. The Plan's exclusion for services and supplies that are not "necessary" is similar to the exclusion in the SPD and is certainly no clearer than the exclusion in the SPD—the Plan excludes from coverage "charges for any service or supply not reasonably necessary for the medical care of the patient's sickness or injury." *See supra* ¶ 18.

4. Medical social services....

5. ... drugs, biologicals, supplies, appliances, and equipment....

6. Medical services ... and,

7. Such other services necessary to the health of the patients as generally provided by the *Facility*.

*See supra* ¶ 7 (emphasis added). The SPD defines "Extended Care Facility" as "an institution, or a distinct part of an institution, which has qualified as an Extended Care Facility for Medicare"; the SPD gives no further details. *See supra* ¶ 8. The SPD defines "Hospital" as "[a]n institution which ... [i]s not primarily a place for rest or the aged ... or a nursing or convalescent home." *See supra* ¶ 8.

Reading these provisions in conjunction with each other, a reasonable insured would expect that the "Extended Convalescent Care Benefits" section is designed to provide coverage for confinement in facilities which provide "extended care" but are not hospitals. An insured would reasonably expect that if he suffers a serious injury or illness that requires hospitalization, and then, after being released from the hospital, is sent directly and at the behest of his doctor into a facility that provides extended care, he would be covered for that care. The SPD would not give an insured reasonable expectations that he would be covered if he moved from his home into a nursing home because of gradual deterioration due to the process of aging. But the SPD does foster reasonable expectations that the Plan will cover expenses incurred in a facility that provides extended care, i.e., "a nursing or convalescent home," if the confinement is the direct product of a catastrophic illness or injury.

Furthermore, the SPD would lead an insured to reasonably expect that the kind of services covered while the insured is in an extended care facility are broad. The "Extended Convalescent Care Benefits" section provides coverage for "room and board ... routine nursing care ... physical or speech therapy ... medical social services ... drugs ... medical services ... and ... other services necessary to the health of the patients." *See supra* ¶ 7. And a separate section of the SPD entitled "General Expenses" provides

coverage for "nursing." *See supra* ¶ 11. Therefore, an insured would reasonably expect coverage for routine, mundane nursing services provided while confined in the extended care facility. As we will discuss in more detail shortly, an insured would not expect the coverage to cease if the nursing services were determined to be "custodial."

 The SPD only alerts an insured to two limits on coverage for extended care. The first limit is that room and board benefits are limited to $6570, or one year. *See supra* ¶ 7. However, the SPD suggests no comparable limits on any of the several other categories of benefits listed in the "Extended Convalescent Care Benefits" section. This would suggest to a reasonable insured that the "Extended Convalescent Care Benefits" section is designed to provide coverage for confinements in extended care facilities that are longer, perhaps much longer, than one year, though room and board will only be paid for one year.

The second limit clearly communicated by the SPD is that confinement in the facility must be "reasonably necessary." This limit is communicated to a reasonable insured in two places—in the statement in the "Extended Convalescent Care Benefits" section that "[i]f necessary and reasonable, the following expenses are covered," and in the exclusion in the "Excluded Expenses" section for "[s]ervices and supplies not reasonably necessary" (or "medically necessary," in the 1991 SPD). However, the exclusion for care that is not "reasonably necessary" or "medically necessary" only clearly communicates to a reasonable insured that confinement in an extended care facility will only be covered if it is reasonably necessary for the insured to be in the facility, i.e., if the insured's medical condition will not reasonably permit him to return to his home. As we will explain in more detail shortly, the exclusion for care that is not "necessary" would not make an insured reasonably expect that care that is "custodial," as defined by U.S. Shoe and Prudential, would not be covered. *See infra* § III(E)(7).

To summarize, an insured would reasonably expect to be covered so long as it was

reasonably necessary for him to be confined in an extended care facility and the confinement followed a hospital confinement for a serious injury or illness. Applying these reasonable expectations to Lancaster's situation, we conclude that Lancaster's conservator could have reasonably expected that Lancaster's confinement at Greenridge would be covered when he signed Lancaster up for the retiree plan and began paying premiums under that plan.

The parties agree that Greenridge is a "facility"—a "convalescent nursing home"—as defined for purposes of the SPD's "Extended Convalescent Care Benefits" section. *See supra* ¶ 19. And U.S. Shoe does not appear to dispute that it is necessary for Lancaster to be in a facility where skilled nursing care is at least available—and that the sole source of this need is the serious accident that occurred in 1988. *See supra* ¶ 29. Given Lancaster's medical condition, we do not think that U.S. Shoe could reasonably dispute that Lancaster needs to be in a facility where skilled care is available. The record shows that Lancaster requires assistance with virtually all his daily living activities. *See supra* ¶ 29. Lancaster's medical records further show that Lancaster's extremely poor condition puts him at risk of choking, shortness of breath, and falling onto the floor from a seated position. *See supra* ¶ 30–31. Even if it is true that unskilled personnel are capable of performing the services and careful observation necessary to minimize these potential dangers, *see supra* ¶¶ 30–31, skilled personnel certainly must be available to respond if the danger minimization measures fail and a medical emergency occurs (if, for example, Lancaster starts to choke).

It appears that the Prudential medical department's interpretation of Lancaster's medical records was that, even though it may have been necessary for Lancaster to be in a facility where skilled care would be available, all or most of the care that Lancaster actually received was care which could have been provided by unskilled personnel and which therefore was "custodial." *See supra* ¶¶ 27, 29. However, under the reasonable expectations doctrine, U.S. Shoe may not validly interpret the terms "medically necessary" or "reasonably necessary" as excluding "custodial" care, whether "custodial care" is defined as care that can be delivered by unskilled personnel, or as care that only maintains a condition, as we will now explain.

**7.** ***Validity of Denial of Coverage on Basis that Care was "Custodial," as Defined as Care that Can be Delivered by Unskilled Personnel.***

 The only reason clearly given by U.S. Shoe and Prudential for its denial of benefits, aside from the 365–day cap on benefits (which we earlier held to be unenforceable under the *Atwood* doctrine, *see supra* § III(D)(3)), was that the care was custodial, and hence not "reasonably necessary" or "medically necessary." *See supra* ¶¶ 34, 35, 39. The main basis on which U.S. Shoe and Prudential distinguished "custodial" care from "necessary" care was that "custodial" care could be delivered by unskilled, untrained personnel. *See supra* ¶¶ 26, 35.

The SPD, however, would not make a reasonable insured expect that care for confinement in an extended care facility would not be covered if the care could be delivered by unskilled persons. Nowhere does the SPD speak of or suggest an exclusion from "Extended Convalescent Care Benefits" for "custodial care."

U.S. Shoe argues that such an exclusion can be inferred from the exclusion for care that is not "reasonably necessary" or "medically necessary." The relevant part of the definition of those two terms states that to be considered "necessary," "a service or supply must be *ordered by a doctor* and be commonly and customarily recognized throughout the doctor's profession as appropriate in the *treatment of the diagnosed sickness or injury.*" *See supra* ¶ 9 (emphasis added). A reasonable layperson would not think that all services or supplies that are ordered by a doctor or used to treat a sickness or injury are services that can only be administered by skilled personnel. Instead, a reasonable insured would think that the exclusion for services and supplies that are not "reasonably necessary" or "medically necessary" reaches supplies and services that, in the opinions of

physicians, would not be necessary to improve, maintain, or lessen deterioration in a patient's medical condition. Certainly, there are services or supplies that may be necessary to improve, maintain, or slow deterioration of a patient's medical condition but can still be administered by unskilled personnel.

Focusing specifically on Lancaster's condition, we note that Lancaster needed to be fed a "mechanical soft diet" and "thickened liquids" in order to keep him from choking, needed to be fastened to his wheelchair with a seatbelt in order to prevent him from falling on the floor, and needed to be periodically repositioned in order to reduce the risk of an ulcer and to treat "contractures of upper and lower extremities." *See supra* ¶¶ 30–31. All these services were surely necessary to prevent deterioration of Lancaster's condition or his death, and all were ordered by Lancaster's doctor. *See supra* ¶¶ 30–31 and administrative record pages cited therein. It appears that at least some of these services, such as fastening a seatbelt on Lancaster's wheelchair, could have been performed by untrained personnel. But that fact would not make an objective insured think that these services were not "necessary" responses to Lancaster's medical condition—or suspect that they would be excluded on the ground that they were merely "custodial."

It could be argued that the use of the term "*medically* necessary," assuming that term (and not the term "reasonably necessary") is the one that applies, should alert a reasonable insured that coverage is denied for services that are not "medical." Under this argument, services that are not "medical" would be those that can be delivered by unskilled, as opposed to "medical," personnel. But this argument ignores standard principles of grammatical construction. "Medically" is an adverb that modifies the word "necessary." A reasonable layman would be much more likely to interpret "medically necessary" as "necessary for medical reasons," rather than as "necessary and 'medical,'" where "medical" somehow contains within it a requirement that the services or supplies can only be delivered by skilled personnel.

There is another reason that a reasonable insured would not expect charges for "custodial" care otherwise payable under the "Extended Convalescent Care Benefits" section to be excluded from coverage. The SPD has a section which provides "Home Health Care Benefits." That section expressly states that coverage for "Home Health Care Expenses" is not offered for "[c]are comprised of services and supplies which are provided to a Covered Individual primarily as *custodial* care assisting him in the activities of daily living." *See supra* ¶ 10 (emphasis added). In addition, in its definitions section, the SPD defines "Home Health Care Facility" as "an organization ... which ... [i]s not, other than incidentally, engaged in ... providing *custodial-type* care." *See supra* ¶ 8 (emphasis added).

The clear exclusion of "custodial" care from coverage under "Home Health Care Benefits," and the lack of any such exclusion in the "Extended Convalescent Care Benefits" section, can only suggest to a reasonable insured that "custodial" care is covered under "Extended Convalescent Care Benefits." Such a distinction would appear sensible to a reasonable insured, since family members can provide the "custodial" care a patient needs if the patient is at home, but it would not seem practical or fair to allocate responsibility for providing "custodial" care to family members if, as a direct result of a covered accident or injury, an insured, on doctor's orders, must be confined in a convalescent or nursing home.

For these reasons, we conclude that, under the reasonable expectations doctrine, U.S. Shoe was prohibited from denying coverage for Lancaster's claim on the grounds that the care given to Lancaster was "custodial," where "custodial" is defined as care that can be delivered by untrained or unskilled personnel. If the purported exclusion for "custodial" care is treated as an exclusion that is buried within the term "reasonably necessary" or "medically necessary," then we have a case like *Saltarelli*, 35 F.3d at 387, where the "attempted exclusion [is] not clear, plain, and conspicuous enough to negate [the] layman['s] ... objectively reasonable expectations of coverage," and is, consequently, "un-

enforceable." If the purported exclusion is treated as one not appearing in the plan description at all, then we have a case like *McConocha,* 898 F.Supp. 545, where the purported limitation on coverage did not appear in the plan and was held invalid under the reasonable expectations doctrine.[12] Either way, we hold that U.S. Shoe's purported exclusion for "custodial" care is unenforceable.

### 8. *Validity of Denial of Coverage on Basis that Care was not "Convalescent" but for Maintenance of Patient's Condition.*

■ We have now rejected all but one of the four reasons that U.S. Shoe and Prudential clearly offered or may have internally relied upon for their denial of coverage. The remaining reason is one that was not clearly given by U.S. Shoe or Prudential in its written denials of coverage. This possible reason for the denial of coverage is that the care Lancaster received at Greenridge was not "convalescent" care because it was not intended to cause, or did not cause, his condition to improve, but was utilized to either maintain his condition or to slow the deterioration of his condition.

This reasoning apparently surfaced in telephone conversations between a Prudential claims representative and the conservator's attorney, *see supra* ¶¶ 24–25, and seems to be implicit in Prudential's definition of "custodial," which states, in part, that custodial care is "[c]are that provides a level of routine *maintenance* for the purpose of meeting personal needs." *See supra* ¶ 26 (emphasis added). While U.S. Shoe does not appear to argue in its opposition to plaintiff's motion that benefits are not owed under the "Extended Convalescent Care Benefits" section if the purpose of the care is not to improve the patient's condition, we examine the validity of this argument anyway, in order to be thorough, and because of the possibility of

U.S. Shoe otherwise making the argument on remand.

The only language in the SPD that would support an argument that extended care benefits are not payable if the care is not intended to (or does not) improve the patient's condition is the use of the word "convalescent" in the heading "Extended Convalescent Care Benefits." Webster's Third New International Dictionary (1993) defines "convalescent" as "1: recovering from sickness or debility: partially restored to health or strength ... 2: of, for, or relating to convalescence or convalescents" and as "one recovering from sickness." Webster's defines "convalescence" as "1: gradual recovery of health and strength after disease ... 2: the time between the subsidence of a disease and complete restoration to health." Webster's defines "convalesce" as "to gather strength: recover health and strength gradually after sickness or weakness." Webster's defines "convalescent home" as "an institution for the care of convalescing patients."

Thus, it can be argued that the use of the word "convalescent" in the heading of the "Extended Convalescent Care Benefits" section should suggest to an insured that the section only provides benefits for care that is intended to aid a patient's recovery from an illness or injury, not care that merely maintains the patient's condition or lessens the speed of the patient's deterioration. However, there is nothing in the text of the section itself, or anywhere else in the SPD, that would support such an interpretation. As explained earlier, the SPD as a whole and the "Extended Convalescent Care Benefits" section specifically would lead a reasonable insured to expect that coverage is provided for confinement in an extended care facility that follows hospital confinement for a serious illness or injury, so long as confinement in the extended care facility is necessary, and that the only limit on coverage is the $6570 ceiling on room and board charges. In our view, the use of the word "convalescent" in

---

**12.** Though underlying policy documents are probably not relevant to the application of the reasonable expectations doctrine where there is a separate SPD, we nevertheless note that the Plan itself does not provide any more support for U.S. Shoe's purported exclusion for "custodial" care

(where the definition of "custodial" care is based on the distinction between care that can be provided by unskilled personnel and care that can only be provided by skilled personnel) than does the SPD. *See supra* ¶¶ 16–18.

one heading is not enough to alter those reasonable expectations.

Furthermore, the "Extended Convalescent Care Benefits" section grants coverage for "[r]oom and board provided by the Facility.... [r]outine nursing care provided by the Facility" and several other categories of services "provided by the Facility." *See supra* ¶ 7. The term "Facility" appears numerous times in the "Extended Convalescent Care Benefits" section. *See supra* ¶ 7. The only definition relating to "Facility" in the "Definitions" section of the SPD is the definition of "Extended Care Facility," which is "an institution, or a distinct part of an institution, which has qualified as an Extended Care Facility for Medicare." *See supra* ¶ 8. The repeated use of the term "Facility" in the "Extended Convalescent Care Benefits" section and the "Extended Care Facility" definition would lead a reasonable insured to expect that coverage is provided for confinement in any facility that provides "extended care" and satisfies certain qualifications for "Facilities" set by Medicare.

In addition, interpreting the Plan as not covering care in an extended care facility *if* that care is intended only to maintain a patient's condition or to slow deterioration of a patient's condition would lead to a strange result. So construed, the Plan would cover a patient whose condition was so poor that he had to be confined in a hospital, even though medical treatment could only maintain his condition or slow its deterioration. The Plan would also cover a patient whose condition was favorable enough to permit him to be placed in an extended care facility, *if* medical treatment could cause his condition to improve. Yet the Plan would not cover the intermediate case where the patient was required to be confined in an extended care facility, not a hospital, but the services he received there were not expected to cause his condition to improve. The use of the word "convalescent" in the heading of the "Extended Convalescent Care Benefits" section is not enough to lead an insured to reasonably expect such a subtle and seemingly senseless construction of the benefits plan.

The exclusion for services and supplies that are not "medically necessary" or "rea-sonably necessary" also does not support an argument that coverage is not provided for extended care that is not intended to (or does not) cause the patient's condition to improve. Persons with terminal conditions often receive medical treatments to prolong their lives, even though the treatments cannot cure them or cause their conditions to improve. No objective insured would reasonably interpret the exclusion for coverage that is not "reasonably necessary" or "medically necessary" as barring coverage for care in an extended care facility which is intended only to maintain a patient's condition or to slow the patient's deterioration.

There is, however, additional support in the underlying policy documents of the Plan for the argument that the "Extended Convalescent Care Benefits" section does not cover care that is not intended to cause a patient's condition to improve. One of the conditions on payment for convalescent care benefits stated in the Plan itself is that "[t]he Convalescent Nursing Home confinement is recommended by [the patient's] Physician for *convalescence* from a condition which caused such Hospital confinement, or from a related condition." *See supra* ¶ 16 (emphasis added).

This provision could support the view that U.S. Shoe and Prudential intended not to provide coverage for care in a convalescent or nursing home if that care was not intended to aid the patient in *recovering* from his illness or injury. However, the apparent intent of the insurer is in conflict with the reasonable expectations of the insured as engendered by the SPD, and, as in *Saltarelli,* 35 F.3d at 386–87, is therefore unenforceable. As in *Saltarelli,* the purported exclusion for extended care in a convalescent or nursing facility that only maintains a patient's condition or slows the patient's decline is unenforceable because it is insufficiently conspicuous.

The exclusion at issue here is actually less conspicuous than the one in *Saltarelli.* In *Saltarelli,* the exclusion clearly appeared in the SPD, but was buried in the SPD's definitional section. *See* 35 F.3d at 385. Here, the exclusion is only hinted at by one word in a heading of the SPD, and the exclusion is buried within the voluminous documents

making up the Plan itself. The purpose of the reasonable expectations doctrine is to prevent such inconspicuous evisceration of the apparent main purpose of the insurance.

### F. Additional Considerations

There are two additional considerations, neither necessary to our ruling, that lend support to our disposition of this motion. The first consideration is the requirement in ERISA that a summary plan description explain the circumstances which may result in loss of benefits in a manner that would be understood by the average insured. The second consideration relates to fairness concerns that inform, in part, the doctrine of estoppel.

### 1. *Inadequacy of Summary Plan Description.*

In *Stahl v. Tony's Building Materials, Inc.*, 875 F.2d 1404 (9th Cir.1989), the court stated that "ERISA requires that a summary plan description explain the 'circumstances which may result in disqualification, ineligibility, or denial or loss of benefits ... in a manner that is calculated to be understood by the average plan participant.'" *Id.* at 1406 (quoting 29 U.S.C. § 1022(b), 29 U.S.C. § 1022(a)(1)). The court added that, under ERISA regulations, "[a] summary plan description 'must not have the effect [of] misleading, misinforming or failing to inform participants and beneficiaries.'" *Id.* (quoting 29 C.F.R. § 2520.102–2(b) (1987)). In a footnote, the court quoted another requirement of ERISA regulations—"[a]ny description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant." *Id.* at 1406 n. 6 (quoting 29 C.F.R. § 2520.102–2 (1987)).

The *Stahl* court explained these statutory and regulatory requirements as follows:

The [summary plan] description ... should provide information about the general circumstances in which benefits could be lost. The plan's rules should be explained to permit the ordinary employee to recognize that certain events or actions could trigger a loss of benefits. It need not discuss every imaginable situation in which such events or actions might occur, but it must be specific enough to enable the ordinary employee to sense when there is a danger that benefits could be lost or diminished.

*Id.* at 1408.

In the case at bar, the SPD did not comply with the requirements of ERISA with respect to the purported exclusions on which U.S. Shoe seeks to rely. The SPD did not explain "in a manner ... calculated to be understood by the average participant," that "Extended Convalescent Care Benefits" were limited to 365 days, that "Extended Convalescent Care Benefits" did not cover care that could be delivered by unskilled personnel, or that "Extended Convalescent Care Benefits" would not pay for care in an extended care facility that only maintained a patient's condition or slowed the patient's deterioration.

U.S. Shoe and Prudential could have easily stated in the SPD, in clear, plain, and brief language, that extended care benefits were limited to 365 days, that extended care benefits did not reach care that could be provided by unskilled personnel, and that extended care benefits were not provided for care that would only maintain a condition or prevent deterioration. Such important limiting provisions should have appeared in the SPD—and should not have been left to argument from definitional inference.

We are unsure, however, whether the ERISA requirements discussed in *Stahl* can serve as a basis for invalidation of a plan administrator's decision separate from the reasonable expectations doctrine and the *Atwood* doctrine, or whether the requirements discussed in *Stahl* only lend support to the reasonable expectations doctrine and the *Atwood* doctrine. In other words, we are not sure whether the *Stahl* analysis can provide any doctrinal grounds for deviation from the abuse of discretion standard that cannot be provided by the reasonable expectations doctrine or the doctrine that an SPD controls over conflicting plan documents.

More practically, we do not know, if presented with a situation where an exclusion relied on by an insurer was not placed in an SPD clearly enough to satisfy the requirements of ERISA, but where the exclusion

neither conflicted with the express terms of the SPD nor with the insured's affirmative reasonable expectations of coverage, whether it would be correct to respond by either holding the exclusion unenforceable or by reviewing the plan *de novo*. The reason for our uncertainty is that in *Stahl* (as well as in the only two other Ninth Circuit cases that we found applying the doctrine discussed in *Stahl—Atwood v. Newmont Gold Co.*, 45 F.3d 1317, 1321–22 (9th Cir.1995), and *Arnold v. Arrow Transp. Co. of Delaware*, 926 F.2d 782, 786–86 (9th Cir.1990)), the court concluded that the requirements of ERISA were not violated by the plan description, so there was no occasion for the court to discuss what the remedy for a violation should be. *See Stahl*, 875 F.2d at 1408–09.

But we need not decide the questions we pose in this section, because we have held that all the purported exclusions expressly or possibly relied on by U.S. Shoe and/or Prudential are unenforceable because they either conflict with the express terms of the SPD or conflict with the reasonable expectations of the insured.

### 2. *Fairness Concerns Related to the Doctrine of Estoppel.*

While plaintiff does not make an estoppel claim,[13] fairness concerns related to the doctrine of estoppel lend some support to our ruling on this motion. Lancaster's conservator enrolled Lancaster in the U.S. Shoe retiree plan in July 1990. *See supra* ¶ 21. Prudential stated in a March 1990 letter to the conservator's attorney that while room and board benefits for extended convalescent care were limited to one year, other benefits listed in the "Extended Convalescent Care Benefits" section of the plan description were payable "for an unlimited number of days." *See supra* ¶ 20. In the March 1990 letter, and in other 1990 correspondence, Prudential did not state that "Extended Convalescent

Care Benefits" were not payable for "custodial care," for care that was not intended to improve a patient's condition, or for confinement that exceeded 365 days. *See supra* ¶¶ 20–22.

These facts might support a claim that U.S. Shoe and Prudential should be estopped from relying on the purported exclusions that they later tried to use to justify the denial of coverage, especially with regard to the 365-day limit on benefits. It is not clear that it would be fair to permit Prudential to deny coverage now on grounds that expressly contradict Prudential's earlier communications to the conservator's attorney, especially communications that could have influenced the conservator's decision to enroll Lancaster in the retiree plan.

### G. *Remedy*

The final matter for us to determine is how to go forward procedurally now that we are granting plaintiff's motion for summary adjudication. In *Saffle v. Sierra Pacific Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 456 (9th Cir.1996), the Ninth Circuit held that if a district court concludes that an ERISA plan administrator has "applied an incorrect standard to its benefits determination," then "the court should not itself decide whether benefits should be awarded but rather should remand to the administrator for it to make that decision under the plan, properly construed." In this case, we have concluded that the reasons expressly given or potentially relied on by U.S. Shoe and Prudential in denying benefits were invalid under the reasonable expectations doctrine, the *Atwood* doctrine, or (in one instance) under the abuse of discretion standard. Since U.S. Shoe and Prudential based their decisions on unenforceable policy provisions and legally impermissible interpretations of the Plan, we must remand the

---

**13.** The Ninth Circuit has held that a plaintiff may not prevail on an equitable estoppel claim under ERISA unless there is ambiguity in the benefit plan. *See Marx v. Loral Corp.*, 87 F.3d 1049, 1056 (9th Cir.1996); *Parker v. BankAmerica Corp.*, 50 F.3d 757, 769 (9th Cir.1995); *Greany v. Western Farm Bureau Life Ins. Co.*, 973 F.2d 812, 821–22 (9th Cir.1992). We are not aware of any Ninth Circuit cases, however, stating whether the ambiguity is required to be present in underlying policy documents or whether it is enough for the ambiguity to be present in an SPD. For the reasons given in our discussion of the reasonable expectations doctrine, we believe that it would probably be correct to only require an ambiguity in the SPD. *See supra* § III(E)(3). But we need not rule on this issue, as plaintiff has not presented an estoppel claim.

case to U.S. Shoe's Benefit Committee for a fresh determination on valid grounds.

On remand, the Benefit Committee must determine the correct amount of benefits owed, pursuant to the specific instructions we will give in the concluding section of this opinion and order. However, it would not be appropriate for the Benefit Committee to rule on some of the relief that the plaintiff has requested, such as pre-judgment interest and attorney's fees. *See supra* ¶ 40. Therefore, we retain jurisdiction over this case. *See Copeland v. Carpenters Dist. Council of Houston & Vicinity Pension Fund,* 771 F.Supp. 807, 810 (E.D.Tex.1991) (court remands ERISA action to plan administrator for further proceedings and retains jurisdiction "until such time as the court determines that all matters arising out of [the] action have been finally disposed of").

### IV. SUMMARY AND ORDER

Plaintiff's motion for summary adjudication of issues is GRANTED. We hold that all the reasons that U.S. Shoe and Prudential expressly relied on or may have internally relied on in denying coverage to Lancaster are invalid. The *Atwood* doctrine prohibits U.S. Shoe from denying coverage based on the 365-day limit on extended care benefits in the Plan, because the SPD only places a 365-day limit on room and board benefits and thereby conflicts with the Plan. *See supra* § III(D)(3). To the extent that U.S. Shoe and/or Prudential may have treated all the Greenridge charges as room and board charges, this was an abuse of discretion. *See supra* § III(D)(4). The reasonable expectations doctrine prohibits U.S. Shoe from denying coverage on the grounds that Lancaster's care is "custodial." *See supra* § III(E)(7). The reasonable expectations doctrine also prohibits U.S. Shoe from denying coverage on the basis that the care given by Greenridge is not intended to improve Lancaster's condition. *See supra* § III(E)(8).

We REMAND this case to the U.S. Shoe Benefit Committee for a redetermination of the benefits to which Lancaster is entitled in accordance with the instructions in this opinion and order. It should go without saying that, on remand, the Benefit Committee may not interpret the Plan in any of the ways held invalid in this opinion and order. In addition, the Benefit Committee may not enforce any provisions in the Plan, such as the exclusion for professional services, *see supra* note 8, that conflict with the SPD or the reasonable expectations of coverage fostered by the SPD.

On remand, in accordance with the reasonable expectations of an objective insured, the Benefit Committee must construe the terms "reasonably necessary" and "medically necessary" as meaning reasonably necessary to improve, maintain, or slow deterioration of Lancaster's medical condition. As we have made clear, care may be "necessary" even though it is "custodial"—i.e., care is "necessary" if Lancaster's condition would worsen without the care, even if it is routine care such as helping Lancaster eat.

The most difficult task for the Benefit Committee on remand may be determining what proportion of Greenridge's charges may fairly be treated as "room and board," as U.S. Shoe is still entitled to enforce the SPD's 365-day limit on "room and board." In making the determination of what qualifies as "room and board," the Benefit Committee is to be guided by the following considerations. First, services and supplies covered in the second through sixth categories enumerated in the "Extended Convalescent Care Benefits" SPD section ("[r]outine nursing care ... [p]hysical or speech therapy ... [m]edical social services ... [d]rugs, biologicals, supplies, appliances and equipment ... [and] [m]edical services") may not be treated as "room and board." Second, in distinguishing between "room and board" and the seventh category in the "Extended Convalescent Care Benefits" section, "such other services necessary to the health of the patients," the Benefit Committee should be guided by the dictionary definition of "room and board"—"food and lodging." The Benefit Committee should treat as "room and board" only those services and supplies provided by Greenridge that would normally be provided by a hotel, motel, or boarding house.

We realize that because much of the cost to Greenridge of providing "room" may be a

cost that Greenridge incurred at one time (as opposed to costs for things such as food and nursing services that are paid out periodically), it may be challenging to determine what portion of the Greenridge charges should be fairly allocated to "room and board." We instruct the Benefit Committee and Greenridge to work together in using generally accepted accounting principles in resolving this issue.

We RETAIN JURISDICTION over this case.

IT IS SO ORDERED.